Matthew M. Levy, J.
In December, 1964, upon the special call of the Governor, the Legislature adopted and the Governor approved certain acts reapportioning and redistricting the State Senate and the State Assembly, and providing for a change in the number of members of those bodies, and the election thereto and the constituencies to be represented therein.
Sections 4 and 5 of article III of the Constitution of this State fix the time and manner of periodic “ readjustments and reap *619 portionments ” of State Senate and Assembly Districts, and provide with precision and specificity a number of important features covered by the legislation referred to.
This legislative action is subject to review by the Supreme Court of this State, by virtue of the express terms of the State Constitution, in section 5 of article III of which it is provided: “ An apportionment by the legislature, or other body, shall be subject to review by the supreme court, at the suit of any citizen, under such reasonable regulations as the legislature may prescribe; and any court before which a cause may be pending involving an apportionment, shall give precedence thereto over all other causes and proceedings, and if said court be not in session it shall convene promptly for the disposition of the same.”
More than a half century ago, the Legislature implemented this provision of the State Constitution by enacting “regulations ” for the “ Review of apportionments by legislature and other bodies.” (L. 1911, ch. 773.) That statute is now chapter 9 of title 13 of McKinney’s Unconsolidated Laws of New York. Section 4221 thereof provides that: “ An apportionment by the legislature shall be subject to review by the supreme court [of this state] at the suit of any citizen, upon the petition of any citizen to the supreme court where any such petitioner resides and upon such service thereof upon the attorney-general, the president of the senate, the speaker of the assembly and the governor, as a justice of the supreme court may direct.”
Two proceedings to review the apportionment were separately duly instituted, and the named State officials were duly served and appeared in each. They were argued together before me on February 5, 1965, and at the request of, and by consent of, the parties, final papers were submitted and received on February 26,1965. There are several common issues of law and fact in the two proceedings and they will be disposed of together.
Five statutes were enacted in December, 1964, known respectively as chapters 976, 977, 978, 979 and 981 of the Laws of 1964. By stipulation of the parties, “ [a]ny issues of fact presented to this Court in these proceedings * * * shall, for purposes of convenience and expedition, be limited to a consideration of Chapter 976 of the Laws of 1964 ”, known by its short title as the ‘ ‘ Reapportionment Compliance Act ’ ’. The court was, ‘ ‘ nevertheless, requested to determine any common questions of law, including validity under the Constitution of the State of New York, in respect of ” all of the December, 1964 laws.
During the hearings on the motions, several dispositions were made by me which, for purposes of completeness and understand *620 ing of the present status of the proceedings and the parties, are now related in capsule form.
Since Village Independent Democrats, a petitioner in one of the proceedings, is not a “ citizen ” authorized by the State Constitution and chapter 773 of the Laws of 1911 to apply to the Supreme Court of this State for review of the apportionment by the Legislature — but is a voluntary association — I granted the motion of the respondents to dismiss the petition insofar as it was brought by the association itself. I directed that there be a severance of that proceeding insofar as the petitioning individuals were concerned, and, as citizens, it was duly continued in their names.
The respondents also moved for a change of venue from New York County to Albany County, both (1) as a matter of law on the ground that the respondents were State officials having their principal offices there and (2) as a matter of discretion, for the convenience of witnesses and because of the more convenient availability of exhibits. Since the proceedings were duly instituted and are now pending in New York County, where the petitioners reside, as provided in the 1911 statute, the respondents withdrew their motion insofar as there was any claim to a transfer to Albany County as a matter of law. And, as a matter of discretion, after hearing argument, I denied the application of the respondents to change the place of trial on the basis of alleged convenience.
Another one of the preliminary matters before me was a number of applications for leave to intervene as parties, to present proof by affidavit or otherwise, to appear as amici curia, to argue, to submit briefs and to otherwise participate in the proceedings. These motions were made by individuals, public officials, business corporations and nonprofit public-spirited organizations.
One of them was by Eugene H. Nickerson, the County Executive of Nassau County (a defendant in the Federal litigation hereinafter referred to) for leave to appear as amicus, to file the brief and other papers attached to the affidavit annexed to the order to show cause that he had procured, and to argue and submit additional papers in support of the petition. The request was opposed by the respondents, on the ground, among others, that since Nassau County was a subsidiary subdivision of the State, it had no status to appear in opposition to the State’s contention as to the validity of the statutes attacked. This application was granted to the extent of permitting Nickerson, County Executive of Nassau County, to appear before this court *621 as amicus curies and to file such briefs as he may be advised, and was otherwise denied, except that factual or documentary materials by way of affidavits or otherwise may be submitted by him through the parties herein, if such parties, in their discretion, determine to present such data to the court.
Frank T. Lamb, individually and as Mayor of the City of Rochester, applied for leave to intervene as a party and to support the petition. This request was opposed by the respondents insofar as the City of Rochester was concerned on the same ground, among others, as that which was the basic objection to Nassau County’s participation. Lamb’s motion was denied by me; but he was permitted to appear in both capacities as amicus curies. I held that whether Nickerson or Lamb was, in the circumstances, exceeding his legal authority to represent the County of Nassau or the City of Rochester, respectively, was not a matter for me to determine in these proceedings; but the remedy of the objecting respondents in that regard is in another forum — electoral, executive or judicial.
Another application was filed by WMCA, Inc., and R. Peter Straus, who were among the plaintiffs in the Federal suit. They sought leave here to file an affidavit as amici curies in support of the petition. This affidavit included a brief on the law and allegations of fact. The respondents objected upon the ground that WMCA, Inc., is a corporation and not a “ citizen ”. This objection was overruled, and the substantive disposition of this application was to the effect that WMCA, Inc., and Straus might appear as amici, and submit briefs on the law but no proof on the facts.
The American Jewish Congress and the New York Civil Liberties Union moved for permission to file a brief amici curies. This motion was denied, but without prejudice to renewal thereof in the event that the issues they sought to project arise during the course of these proceedings. As expressed in the affidavit filed in support of this application, these issues are more specifically concerned with the preservation of “ equal representation for the social, economic and political interests of minority groups that have been particular targets of majority discrimination ”, and opposition to “ any limitation” of the right of franchise whether that limitation “ derives from a fact of history or an explicit intention to prefer one class at the expense of another ”. “ And one of the bases of the instant application is the belief of the amici that the issue of reapportionment should be removed from the partisan political arena and be handled by an independent non-partisan commission.”
*622 I
THE COURTS OF THE UNITED STATES AND THE NEW YORK CONSTITUTIONAL SCHEME OF APPORTIONMENT OF STATE SENATE AND STATE ASSEMBLY DISTRICTS
Section 2 of article III of the New York State Constitution provides that the State Senate shall consist of 50 members, except as thereinafter provided upon increase of population, that the State Assembly .shall consist of 150 members (without provision for increase), and that the Senators and Assemblymen shall be elected in even numbered years for two-year terms each. Present section 3 continued the Senate Districts as established in the 1894 State Constitution 1 ‘ for all of the purposes of future re apportionments of senate districts pursuant to section four ”. As implemented by section 121 of the State Law, the number of Senators, as of November, 1964, was 58, and the boundaries of their districts were established therein. Section 4 of article III of the State Constitution provides that the decennial Federal census shall be the basis for periodic reapportionment, sets out when the reapportionments of the Senate are to occur, and imposes several governing rules and formulae. Section 5 specifies rules and formulae with regard to the reapportionment of the Assembly; and sections 122-124 of the State Law contain implementing provisions in regard to assembly districts and the apportionment of that House.
I do not deem it needful, at this point, to detail further the formulae established by the State Constitution for the readjustments of districts and the apportionment of legislative seats. Suffice it to say here that in WMCA v. Lomenzo (377 U. S. 633, 635-641 [1964]), the Supreme Court of the United States, reversing a three-judge District Court decision, held that New York’s “ scheme of legislative apportionment ”, contained in article III of the New York State Constitution, violated the Constitution of the United States. That court interpreted the equal protection clause contained in the Fourteenth Amendment to require “ that seats in both houses of a bicameral state legislature must be apportioned substantially on a population basis ”, found that “ New York’s constitutional formulas relating to legislative apportionment demonstrably include a built-in bias against voters living in the State’s more populous counties ” (377 U. S. 653-654), and remanded the case to the District Court for further proceedings. On July 27, 1964, the District Court, among other things, decreed that the 1964 legislative election shall be for a one-year term, and ‘ ‘ that not later than April 1, 1965, the Legislature shall have enacted *623 into law a valid apportionment scheme that is in compliance with the XIV Amendment of the United States Constitution and which shall be implemented so as to effect the election of Members of the Legislature at the election in November, 1965, Members .so elected to hold office for a term of one year ending December 31, 1966.” (238 F. Supp. 916, 919 [1965].)
"While I have deemed it necessary — for a proper understanding and disposition of the issues before me in the present proceedings — to acquaint myself with the vicissitudes of the Federal constitutional status of the New York plan of apportionment as established in the State Constitution and the implementing statutes in force at the time of the enactment of the Reapportionment Compliance Act and the related statutes of 1964, challenged in the present proceedings, I see no need to narrate that history here. I do wish to record, however, that the several concurring and conflicting judicial viewpoints of the United States courts are to be found in WMCA v. Simon (196 F. Supp. 758 [1961], 202 F. Supp. 741 [1962], 370 U. S. 190, 191 [1962], 208 F. Supp. 368 [1962]), and in WMCA v. Lomenzo (377 U. S. 633 [1964] and 238 F. Supp. 916 [1965]).
II
THE ISSUE
The basic issue before me is the validity, under the Constitution of the State of New York, of the five December, 1964 reapportionment enactments of the State Legislature. Their validity under the Constitution of the United States is not for me now to determine. That issue has been disposed of — for the present at least — by the order of the District Court of the United States for the Southern District of New York in WMCA v. Lomenzo (238 F. Supp. 916, supra), in holding chapter 976 (the Reapportionment Compliance Act) valid from the point of view of the Fourteenth Amendment, and in holding the other chapters — 977, 978, 979 and 981 (the Alternative Reapportionment Plans) —unconstitutional.
As to the validity of these statutes under the New York State Constitution (the issue requiring resolution by me) I quote from the opinion of Circuit Judge Waterman, speaking for the three-Judge statutory District Court: “ [T]his court declines to pass on plaintiffs’ claims that the Reapportionment Compliance Act is invalid under the New York State Constitution. Together with the issue of inseparability, these claims raise difficult problems of state law interpretation; our examination of the briefs of the parties and the cases cited therein makes this fact amply clear. Moreover, we are here concerned with *624 a matter of the utmost sensitivity and importance to the people of the State of New York.” (WMCA v. Lomenzo, 238 F. Supp. 916, 921-922, supra.)
Thus, the jurisdiction of this court over the person of the respondents and the subject matter of the proceedings is well established by virtue of the New York State Constitution, the applicable State statutes, and the reticence of the United States courts.
The respondents moved, pursuant to CPLR 3211 (subd. [a]), for an order dismissing the petitions upon the ground that they fail to state a cause of action and in that, upon the documentary evidence presented, chapter 976 of the Laws of 1964 (the Reapportionment Compliance Act) is a valid statute. I denied the motion, stating that I would express the bases for my decision in a later opinion, and this memorandum is, in part, the vehicle for such expression. I granted leave to the respondents formally to answer the petitions, if they were so advised; and leave, on consent, was also given to all the parties to submit additional proof by way of affidavit, record, map, and other document. As I stated earlier in this opinion, the record became complete on February 26, 1965; and now I come to a consideration of the merits.
Ill
THE CONSTITUTIONAL VALIDITY OF REAPPORTIONMENT AT A SPECIAL SESSION OF THE LEGISLATURE
The petitioners contend that the subject legislation violates sections 4 and 5 of article III of the New York State Constitution in that the reapportionment was enacted at a special session of the Legislature. I have come to the considered conclusion that — whatever bearing the calling and holding and acting by way of a special session of a so-called “lame-duck” Legislature may have on another issue in the case, hereinafter discussed— the Reapportionment Compliance Act is not rendered unconstitutional by virtue of having been enacted, per se, by such special session.*
*625 As to this issue, it is to be noted that article III of the State Constitution makes the decennial Federal population census the base for the reapportionment of members of the Legislature and the readjustment or alteration of Senate and Assembly Districts, and then reads:
Section 4: “ The legislature, by law, may provide in its discretion for an enumeration by state authorities of the inhabitants of the state, to be used for such purposes, in place of a federal census, when the return of a decennial federal census is delayed so that it is not available at the beginning of the regular session of the legislature in the second year after the year nineteen hundred thirty or after any tenth year * * *, or if an apportionment of members of assembly and readjustment or alteration of senate districts is not made at or before such a session. At the regular session in the year nineteen hundred thirty-two, and at the first regular session after the year nineteen hundred forty and after each tenth year therefrom the senate districts shall be readjusted or altered, but if, in any decade, counting from and including that which begins with the year nineteen hundred thirty-one, such a readjustment or alteration is not made at the time above prescribed, it shall be made at a subsequent session occurring’ not later than the sixth year of such decade, meaning not later than nineteen hundred thirty-six, nineteen hundred forty-six, nineteen hundred fifty-six, and so on; provided, however, that if such districts shall have been readjusted or altered by law in either of the years nineteen hundred thirty or nineteen hundred thirty-one, they shall remain unaltered until the first regular session after the year nineteen hundred forty.” (Emphasis supplied.)
And in section 5: “ The members of the assembly shall be chosen by single districts and shall be apportioned by the legislature at each regular session at which the senate districts are readjusted or altered, and by the same law, among the several counties of the state, as nearly as may be according to the number of their respective inhabitants, excluding aliens.” (Emphasis supplied.)
In Matter of Reynolds (Cobb) (202 N. Y. 430 [1911]), the Yew York Court of Appeals held that the “first regular session ’ ’ provision of section 4 of article III was directory only. The court there said, at pages 443- -144:
“The objection that the apportionment was made at an extraordinary session of the legislature is not well founded. As to apportionments the Constitution provides: ‘ The said districts shall be so altered by the Legislature at the first regular session after the return of every enumeration.’ (Article ITT, *626 section 4.) The question is whether the provision as to the regular session is a qualification as to the character of the session at which an apportionment bill can be enacted, or whether it is merely part of the definition of the time or period at which the duty is imposed on the legislature to make a new apportionment. We think it is clearly the latter. ‘ First regular ’ merely prescribes when the legislature is first empowered to alter the districts for legislative representation.
“ * * ” If our interpretation of the Constitution is correct, the power vested in and imposed upon the legislature to pass a constitutional apportionment bill was a continuing one until exercised and discharged, and the legislature at any time after the time prescribed by the Constitution and at any character of session, might discharge the duty which was still undischarged ” (emphasis supplied).
It is readily apparent that “ the time proscribed by the Constitution ’ ’ was there held by the court to be “ the first regular session after the return of every enumeration.” History supported this interpretation at the time of its rendition (see People ex rel. Carter v. jBice, 135 N. Y. 473 [1892], which served as the catalyst for the important Constitutional Convention leading to the adoption of the Constitution of 1894). A careful study of the relevant amendments to the Constitution, as well as of the proposed amendments, requires the same interpretation today.
That the phrase was changed by constitutional amendment in 1931 to ‘1 the first regular session after the year nineteen hundred forty and after every tenth year therefrom” does not weaken the force of the holding of the Court of Appeals, since the wording is quite clearly intended for the purpose of basing apportionment on the Federal census. Similarly, the provision, also made a part of section 4 in 1931, which authorizes a State census “ when the return of a decennial federal census is delayed so that it is not available at the beginning of the regular session in the second year after the year nineteen hundred thirty or after any tenth year therefrom,” does not appear to me to affect the reasoning in Matter of Reynolds (Cobb) (supra), or the conclusion there reached that “ the provision as to the regular session * * * is merely part of the definition of the time or period at which the duty is imposed on the legislature to make a new apportionment.” (202 N. Y. 430, 443.)
By the principle of stare decisis, I am bound by what the Court of Appeals held in that case. It is not for me to hypothesize what the court might say today — albeit a half century later. It has spoken in unmistakably clear language, and I am governed thereby.
*627 I deem it appropriate nonetheless — in view of the passage of time, the amendments to the State Constitution, the order of the Federal court, the importance of the question, the earnestness with which the point is pressed by the petitioners and the amici curiae who have filed briefs in their support, and the concern as to this issue that I expressed upon the oral argument— for me to give consideration in this opinion to the points raised in regard thereto.
First, as to the holding of the United States District Court. That court said that, by its order ‘1 we gave the Legislature sufficient time to reapportion during a regular session ” (WMCA v. Lomenzo, 238 F. Supp. 916, 921, supra). The petitioners cannot rely on any inference from that statement that, in the view or decision of the United States Court, the reapportionment must, as a matter of law, be enacted at a regular session of the Legislature. Indeed, that statement was made in the course of the court’s pointing out that “ we are not passing on claims under the State Constitution ” (emphasis supplied).
It is suggested by the petitioners and on behalf of Nassau County, that there has been a long history of attempts to confine the Legislature’s power to reapportion to “ regular ” sessions. The history appears to have begun with People ex rel. Carter v. Rice (135 N. Y. 473 [1892], supra) where the Court of Appeals said, per Peckham, J. (pp. 484 — 486):
“ First. It is contended on the part of those who allege the invalidity of the law of 1892, that it was passed in violation of that provision of the Constitution which directs the alteration to be made by the legislature at the ‘ first session after the return of every enumeration. ’
“ The act was in truth passed at an extraordinary session of the legislature called by the Governor, and after the return of the enumeration of 1892. The point is made that an extraordinary session is not such a session of the legislature as is contemplated by the Constitution. To my mind the objection is wholly without force. An extraordinary session is, nevertheless, a session of the legislature. * * * It is not a regular session, it is true; it is what the Constitution describes it, an extraordinary session, but yet a session of the legislature. * * * The Constitution does not provide that the next legislature after the return of the enumeration at its first session shall make this apportionment. It is directed to be made by the legislature at the first session after such return. Wherein does this extraordinary session fail to fill that description? It was a session of the legislature and it was the first which was held after the return of the enumeration, and it was competent to deal *628 with that subject because of the recommendation of the Governor,
“ There is no basis, in the language of the Constitution, for the claim that the session of the legislature referred to in that instrument is the first session of the legislature which itself first convenes after the return of the apportionment [enumeration!].” (Emphasis in the original.)
Two years later, sections 4 and 5 of article III were amended by insertion of the word “ regular ” before “ session ”. On the basis of a comment by Lincoln in his Constitutional History of New.York, an isolated quotation from the minutes of the Constitutional Convention of 1894, and the argument of the State Attorney-General in the 1907 case of Matter of Sherrill v. O’Brien (188 N. Y. 185) the petitioners assert that this change in wording shows that “ special ” sessions of the Legislature may not apportion. It is my view, however, that these authorities are of insufficient weight to support the contention — especially in view of the fact that they were available to the Court of Appeals when it decided Matter of Reynolds (Cobb) (supra).
In addition, the Nassau County brief discusses various proposed constitutional amendments, in support of the petitioners’ statement that there has been a long struggle in this State to prohibit apportionment by a special session. While this history may indeed demonstrate that proposition, it does not indicate that the result sought has been achieved. The 1915 proposal was not adopted, for the People rejected the entire proposed Constitution. The 1916 proposal was not even submitted to the People. Further, although as stated in the brief, delegate Poletti proposed a constitutional amendment at the Constitutional Convention of 1938 for the establishment of a board of reapportionment which would act if the Legislature failed to do so “ during two successive regular sessions ” (cited in the brief without identification; thereafter specified as Print No. 645, Int. No. 617), he spoke of “ two successive sessions ”, without indicating a requirement that they must be “ regular ” ones (I Revised Record, New York State Constitutional Convention of 1938, p. 267). Moreover, the proposal was not adopted by the Convention (id., Index, p. 200).
The brief presented by Nassau County and embraced by the petitioners seeks to distinguish Matter of Reynolds (Cobb) (supra). It is there argued that: “the decision in Reynolds [Cobb] made sense grammatically and practically. At that time a state census was used for apportionment. It was physically possible to have the state census completed' and then to apportion at a special session before the first regular session *629 following the census. * * * The state census was to be made, it should be noted, in May and June of each year. * * * A special session could, therefore, have been called anytime from July to the end of December. But since section 4 of article 3 now provides that the Legislature may not apportion until after the first year of the decade, and since article 13, section 10 [sic, section 9, now section 4] of the New York Constitution requires the Legislature to convene within the first few days of January, there is no practical opportunity for an apportionment at a special session prior to the regular session of the year in which the Legislature is first empowered to apportion. This fact, as well as language changes in section 5 of article 4 [sic, art. Ill], which are noted below, makes the Reynolds decision inapplicable in the instant case (emphasis supplied).”
The italicized matter is the crux of one theory of the argued differentiation; the change in section 5 the crux of a second.
As to the first, I am unable to perceive any inconsistency with Matter of Reynolds (Cobb) (supra). In 1931, section 4 was amended to add the wholly new provision that: “if, in any decade, * * * such a readjustment or alteration [of senate districts] is not made at the time above prescribed, it shall be made at a subsequent session (emphasis supplied) ”.
Once again, as in Matter of Reynolds (Cobb) (supra) “the time prescribed ” is “ the first regular session ” and I find it quite logical and reasonable that provision has been made to apportion as quickly as possible after the census — if not at “ the first regulár session ”, then at a “ subsequent session ”. I see no reason why if — in normal circumstances — the regular session has failed to act, the People must necessarily wait until the next regular session to obtain properly apportioned representation. Since the Legislature might not, at the time when “ first empowered to apportion ”, do so, a “ subsequent session ” would then be required to make the apportionment.
This leads me to the petitioners’ second theory, which is based upon the wording of section 5. In 1931, that section was amended to read (new matter is in italics; matter which was deleted is in brackets): “ Section 5. The members of the assembly shall be chosen by single districts and shall be apportioned by the legislature at [the first] each regular session [after the return of every enumeration] at which the senate districts are readjusted or altered, and by the same law ”.
The petitioners contend (by way of the Nassau County brief) that: “ The fact that the word ‘ session ’ is used once in section 4 does not permit the phrase ‘ each regular session ’ in section *630 5 to be read as ‘ each, regular or special session A natural reading of sections 4 and 5 together reveals a plan to permit apportioning of both houses at regular sessions only.”
I agree that sections 4 and 5 must be read together, but that reading does not indicate to me any ipso facto prohibition against a proper apportionment at a special session.
It appears to me that section 4 is controlling. This section provides, as has been seen, that the Federal census shall be the usual basis for apportionment as to both bodies, and sets out the circumstances in which a State enumeration shall be used in place thereof or in addition thereto. Section 5 does not mention the census at all, but does state that the Assembly shall be apportioned ‘1 by the same law ” as is the Senate. It is plain that the census provisions of section 4 are also operative with, regard to the Assembly. And, since section 4 is controlling as to the basis for the apportionment and since both Houses must be apportioned “ by the same law ”, I view it as likewise controlling as to the time of such apportionment, with the result that section 5 is to be read as directing apportionment of the Assembly “ at each regular [or subsequent] session at which senate districts are readjusted or altered, and by the same law. ’ ’
Further, having concluded, as I stated earlier in this opinion, that the “ subsequent session” referred to in section 4 need not be a “ regular ’ ’ one, I likewise conclude that section 5 permits apportionment at a “ special ” session.
Because of the serious nature of the challenge raised by this issue, I have, as I have said, taken the time to discuss the petitioners’ specific contentions on this point. My analysis of them reinforces the conclusion to which the principle of stare decisis has also brought me — there is nothing unconstitutional in an appropriate apportionment at an Extraordinary Session of the Legislature.
IV
THE CONSTITUTIONAL VALIDITY OF THE LEGISLATIVE INCREASE OF THE NUMBER OF ASSEMBLYMEN
Section 2 of article III of the New York State Constitution provides that “ The assembly shall consist of one hundred and fifty members.” The Reapportionment Compliance Act (L. 1964, ch. 976, § 301) provides for an Assembly of 165 members. The Alternative Reapportionment Plans fix the number of assemblymen to be 180 (ch. 977), 186 (ch. 979) and 174 (ch. 981).
*631 The initial and all-pervasive critical factor on this issue lies in the extent to which section 2 of article III of the Constitution of the State of New York contravenes the Fourteenth Amendment of the United States Constitution, for to that extent the provisions of the State Constitution no longer serve as valid criteria to test the subject enactments.
Decisional guidelines require the conclusion that “ the knife [be] laid to the branch instead of at the roots ” of article III of the New York State Constitution. (People ex rel. Alpha Portland Cement Co. v. Knapp, 230 N. Y. 48, 60 [1920], Cardozo, J.) The United States Supreme Court in WMCA v. Lomenzo (377 U. S. 633, 653 [1964], supra), found the “ scheme of legislative apportionment” in New York to be repugnant to the Fourteenth Amendment and “ remand[ed] the case to the District Court for further proceedings consistent with the views stated here and in [the] * * * opinion in Reynolds v. Sims ” (p. 655). Of paramount significance is the principle enunciated by the Supreme Court of the United States in the referred-to case of Reynolds v. Sims (377 U. S. 533, 584), the first of the group of cases which were decided June 15, 1964, and which included WMCA v. Lomenso {supra): “ State constitutional provisions should be deemed violative of the Federal Constitution only when validly asserted constitutional rights could not otherwise be protected and effectuated. Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible. * * # When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls ’ ’.
In Lomenzo (377 U. S. 633, 646-651 [1964], supra) the court discusses the formulae of apportionment, and their result, and, at page 653, ‘ ‘ the state constitutional formulas and the implementing statutory provisions [State Law, art. 8] here attacked,” and held “ that the District Court [had] erred in upholding the constitutionality of New York’s scheme of legislative apportionment.” At page 654, the United States Supreme Court said: “ Despite the opaque intricacies of New York’s constitutional formulas relating to legislative apportionment, when the effect of these provisions, and the statutes implementing them, on the right to vote of those individuals living in the disfavored areas of the State is considered, we conclude that neither the existing scheme nor the forthcoming one can be constitutionally condoned.”
*632 Nothing in the determination of the Supreme Court of the United States in the case of WMCA v. Lomenzo (supra) nor in the United States District Court’s implementation thereof required that section 2 of article III be expunged. On the contrary, in Reynolds v. Sims (supra), the United States Supreme Court explicitly stated in a significant footnote at page 581 of 377 U. S. 533: “ Determining the size of its legislative bodies is of course a matter within the discretion of each individual State. Nothing in this opinion should be read as indicating that there are any federal constitutional máximums or mínimums on the size of state legislative bodies.”
I am supported in my conclusion as to the restrictive nature of the Federal order by noting that, in complying with the prescriptions laid down by the United States Supreme Court, the District Court confined its implementing order -of July 27, 1964 to the “ scheme of legislative apportionment of the State of New York” (238 F. Supp. 916, 918), and that its order dated January 26, 1965, specifically stated, as paragraph 1, that: “Article III of the New York State Constitution is invalid under Amendment XIY of the United States Constitution only to the extent that its provisions are in unavoidable conflict with the decision of the United States Supreme Court in WMCA, Inc. v. Lomenzo, 377 U. S. 633 [1964] and with the order of -this court dated July 27, 1964.” (238 F. Supp. 916, 927; see, also, the opinion of February 1, 1965, at page 921 of 238 F. Supp.; see Redlich, Constitutional Law, 16 Syracuse L. Rev. 211, 227-228.)
Consideration of these statements has led me to the view that the “ apportionment scheme ”, referred to in Lomenzo {supra) and therein held invalid, is composed of the formulae found in sections 4 and 5 of article III of the State Constitution and the statutes found in article 8 of the State Law — and no more. Thus viewed, the “ scheme ”, as a whole, can be seen as a .subsidiary means of implementing the mandate of section 2 .of article. Ill of the State Constitution as to the size of the Legislature. And I hold that there is nothing inherent in the invalidation of this ‘ ‘ scheme ’ ’ which would require that the provision of section 2 dictating the -size of the Assembly be likewise considered invalid.
True it is, as the respondents have stated in their brief, that the United States Supreme Court in Lomenzo (377 U. S. 633, 654, supra) said: “ With the size of the Assembly fixed at 150, with a substantial number of Assembly seats distributed to sparsely populated counties without regard to population, and with an *633 additional seat given to counties having 1% population ratios, the population-variance ratios between the more populous and the less populous counties will continually increase so long as population growth proceeds at a disparate rate in various areas of the State ” (emphasis supplied). However, I do not read this as holding that the number of Assembly seats is among the provisions condemned but, rather, as a fact which the Court is stating as a prelude to what has been found to be in conflict with the Fourteenth Amendment. To read it otherwise would do violence to the consistency which I find to exist in the Lomenso opinion with regard to this question.
It is further to be noted that the word “ apportion” means to divide up, to allot, and that “ apportionment ” is the result of such division or allocation. To apportion, there must be something to be apportioned and, in this instance, that “ something ’ ’ appears to me to be 150 Assembly seats. I am not persuaded that the United States courts went beyond the “ apportionment ” provisions and declared invalid the mandate of the State Constitution that it is 150 Assembly seats — no more, no less — which are to be apportioned.
It may be suggested that, in arriving at my conclusion on this point, I have given too literal readings to the words and phrases involved. But words do have meanings, and it must always be borne in mind that just as a statute is not to be readily invalidated, a fortiori, a constitutional provision is certainly not to be lightly struck down. It is my judicial duty to seek to uphold our State Constitution; and it follows that I may declare myself unable to do so in the instant matter only when I find that the constitutional provision can in no way be reconciled with what the Federal courts have said, and are in that “ unavoidable conflict ” in respect of the matters of which they spoke. It is not in the least difficult to hold that I do not find such ‘‘ unavoidable conflict ’ ’ here.
I have come to the conclusion, too, that an argument presented by the respondents for the legislative increase in Assembly seats is not only irrelevant, but, even were it pertinent, it cannot be based here upon what is sometimes called the “ historic constitutional policy ’ ’ of giving each county at least one seat of its own. For, as can be seen in chapter 976, even with the increase from 150 to 165, this policy has not been observed. The following are examples of the new Assembly districts which make this strikingly plain. The combination of one entire county with a part of another: 107 A. D. and 110 A. D.; portions of two counties : 164 A. D. and 165 A. D,; two entire counties: 124 A, D, and *634 149 A. D.; two entire counties with part of a third: 111 A. D. and 150 A. D.; and three entire counties: 141 A. D. Other new Assembly districts which may be appropriate to mention here are numbered: 115, 118, 119, 120, 122, 123, 127, 128, 131, 132, 137,138 and 142.
It is also argued by the respondents that the increase by the Legislature of the number of members of the Assembly resulted from the recommendation of the legislative committee which followed the recommendation of the citizens’ committee. As stated in the Report of the Joint Legislative Committee on Reapportionment, December 15, 1964 (N. Y. Legis. Doc., 1964, No. 76, p. 9):
“ Increases in size of both Houses will, as noted by the Citizens’ Committee [Report to Governor Nelson A. Rockefeller by the Citizens’ Committee on Reapportionment, Dec. 1, 1964, p. 22], make possible a legislative apportionment that would:
“ 1. More reasonably and practically conform to the ‘ one-man, one-vote ’ principle, and
“ 2. Increase the representation of urban and suburban areas, and still allow smaller counties a voice.”
However, reasonableness and practicality, by whomsoever expressed, have never been — and cannot now be — valid grounds upon which to base an excision of a constitutional mandate. Nor are they an adequate basis upon which to misread or interpret the United States Supreme Court decisions as invalidating the provisions of the State Constitution involved.
I am, likewise, unpersuaded by the second thesis — that of maintaining the voice with which the smaller counties speak in our Legislature. By this I do not mean to imply that I am personally or judicially unsympathetic to the situation of the less populous areas of our State — quite the contrary. But I am desirous of determining (and am indeed constrained to resolve) the issues before me with regard solely to the valid requirements of our Constitution. And, since the disparate loudness of the voice of the smaller counties appears to me to be exactly what the United States Supreme Court held, in Lomenso (supra), was condemned by the Federal Constitution, I do not find any substance in that assertion upon which to ignore the provision of the State Constitution.
If, notwithstanding the clear and precise mandate of the State Constitution — that there be 150 Assembly seats to be apportioned— and, notwithstanding the absence of any “ unavoidable conflict ” with the United States Constitution as interpreted by the Supreme Court of the United States, the Legislature, as it *635 wills, may establish 165 seats, it may with equal justification, assume to fix the number at 265 or 65. And, if another citizens committee or another joint legislative committee or another State Legislature finds or assumes to find that another number will ‘1 more reasonably and practically conform to the ‘ one-man, one-vote ’ principle ” and “ increase the representation of urban and suburban areas, and still allow smaller counties a voice ”, there will be another change — up or down. That is not constitutional government and that cannot be. The specification of the number was placed in the State Constitution by the people, and it should not be changed except by appropriate constitutional amendment voted upon by the people. For the concept of a constitutional mandatory prescription of the number of members of the legislative branch of our Government is deeply rooted in the tradition of the State of New York, and section 2 of article III can be traced to the Constitution of 1777 (arts. IV, X as later amd. in 1801; art. I, § 2 in 1821; art. Ill, § 2 in 1846; art.III, § 2 in 1894 as later amd. in 1937).
It has been argued by the respondents that, when the United States Supreme Court invalidated a portion of article III, it must be considered that the article was declared unconstitutional as a whole. In support of that contention they make references to the Revised Record of the Constitutional Convention of 1894 and to principles for construction of statutes and of constitutional provisions.
I am unable to conclude, after a thorough review of the Convention Record, that the provision for 150 assemblymen is so interwoven with the apportionment scheme, which was also proposed by that Convention, that the requirement of the number, too, must necessarily fail. It appears to me that the Record of the Convention is as consistent with the conclusion that the size of each House was increased due to population growth and — separately and in addition — a new scheme was adopted of apportioning the numbers of Senators and Assemblymen, as it is with the contention that these changes are inextricably interwoven. That being the case, I cannot hold that one change proposed by the Convention, and adopted by the people, must necessarily fail because another has been declared impermissible under the United States Constitution. I have, earlier in this opinion, stated what I believe to be the cardinal rule of construction here applicable, and it is unnecessary for me to repeat that discussion at this point.
It is relevant to point out that, in the statute here under review, it is said in subdivision 2 of section 102 (L. 1964, ch. 976), *636 as a part of the “ statement of policy”, that the Legislature felt obliged to ‘1 enact legislation notwithstanding the provisions of New York state’s constitution”. I am constrained to find that that is so only to the extent that the State Constitution has been invalidated by the United States courts. Since I have concluded that the section 2 of article III provision for 150 Assemblymen has not been invalidated, it follows that the increase of the size of the Assembly was beyond the power of the Legislature.
The New York Court of Appeals has asked, in a closely related context: “ Can it be doubted that in view of the history of constitutional changes in regard to legislative apportionment which shows a gradual withdrawal from the legislature of discretionary power and a continued adding of limitations upon their power relating thereto, and in view of the clear intention of the constitutional convention of 1894 and of the People in adopting the Constitution that this court should now hold that the minimum of discretion necessary to preserve county and other lines and to give reasonable consideration to the other provisions of the Constitution, is left to the legislature ? ” (Matter of Sherrill v. O’Brien, 188 N. Y. 185, 206 [1907], supra.)
That I have concluded that it was not within the power of the Legislature to increase the .size of the Assembly does not mean that the number can never be changed. The previous uniform practice has been to embody such a change in either a new Constitution or in a constitutional amendment, to be adopted by vote of the people. (See Report of the Citizens’ Committee on Reapportionment, Dec. 1, 1964, Appendix 8, History of New York Apportionment, pp. 92-93.) I believe that only this method is available on this aspect of the case, and that, unless and until it is utilized, the size of the Assembly, as set out in section 2 of article III must stand.
For the reasons which I have hereinbefore stated, I have undertaken this painstaking — and perhaps too extended — examination of article III of the New York State Constitution within the context of the relevant Federal and State judicial pronouncements and of the historical background of that provision. I am led to the opinion that the Legislature was not empowered to draw the legislative apportionment lines on a tabula rasa, and that the Legislature’s obvious cavalier disregard for the constitutional mandate of an Assembly composed of 150 members constitutes an arrogation oP power and renders, at the very least, the Reapportionment Compliance Act invalid insofar as it so provides, including the concomitant effect upon the whole Assembly District apportionment and districting.
*637 In November, 1963, a new section was added to the State Constitution, empowering the Legislature to provide for “ emergency governmental operation ’ It is section 25 of article III. It has not been referred to by any counsel, but I am of the opinion that I should mention it here so as to let it be known that it has not been overlooked. It reads as follows:
“ Notwithstanding any other provision of this constitution, the legislature, in order to insure continuity of state and local governmental operations in periods of emergency caused by enemy attack or by disasters (natural or otherwise), shall have the power and the immediate duty (1) to provide for prompt and temporary succession to the powers and duties of public offices, of whatever nature and whether filled by election or appointment, the incumbents of which may become unavailable for carrying on the powers and duties of such offices, and (2) to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations.
‘ ‘ Nothing in this article shall be construed to limit in any way the power of the state to deal with emergencies arising from any cause.”
I do not deem the situation created by or resulting from the decisions of the United States courts — which required the enactment of apportionment legislation — to have been caused by an enemy attack or by disaster or to be such an emergency as to have required the abandonment of all of the provisions of article III of the State Constitution. The “emergency” envisaged by section 25 must be — and I so hold — one more dire and critical than the basis presented here for the Legislature’s action.
V
THE CONSTITUTIONAL VALIDITY OF THE 1964 BEAPPORTIONMENT AND BEDISTBICTING OF THE STATE SENATE
There is no need to outline at this point the study that has been made by me as to the effect of the decisions of the United States courts on the status of the State Senate districts and as to the effect upon them of the Beapportionment Compliance Act.
The State Constitution provides that the reapportionment and redistricting of the Senate and Assembly shall be “by the same law” (art. Ill, § 5). I shall not express here the background basis or fathom the nonarticul¡ated reason for this requirement For present purposes, it suffices that the language of the Constitution is simple and plain. It is made quite clear that, in adopting this article of the Constitution, the people of the State, by specific mandate, forbade a severance of the *638 Houses of the Legislature for the purposes of reapportionment and redistricting. The two are inseparable and if one falls because of invalidity, the other must fall with it.
And I hold this to be so, notwithstanding that the Reapportionment Compliance Act of 1964, in section 401, provides for ‘ ‘ separability ’ ’. That statute is applicable, by its terms, where “ any part or provision of this act relating to any district described in article two or article three of this act shall be adjudged invalid by a court of competent jurisdiction ”. It does not purport to save the statute in respect of one house, when the act in respect of the other house as a whole is held void.
But even if the statute undertook to do so, the Constitution takes precedence and governs.
I hold, therefore, that the 1964 statutes are void as to the Senate reapportionment and redistricting, as well as that of the Assembly.
This determination is supported by the rulings of the courts as to the Colorado and New Jersey Legislatures, even without reliance upon a constitutional clause such as the express provision of the New York State Constitution, above referred to — that the reapportionment and redistricting of the two houses of the New York State Legislature shall be “by the same law ” (art. Ill, § 5). I quote from the opinion of the Supreme Court of New Jersey, in Jackman v. Bodine (43 N. J. 453, 460-461): “If the Senate [of New Jersey] is malapportioned, we need not consider whether the General Assembly [of New Jersey] could pass muster. In Lucas [v. Forty-Fourth General Assembly of Colorado, 377 U. S. 713] the Supreme Court [of the United States] held that if one house is malapportioned, the deficiency vitiates the entire legislative structure, obviating the need for considering whether the second house could withstand an attack upon it if it were the sole legislative body. 377 U. S., at p. 713 [735], 84 S. Ct., at p. 1459 [sic, 1485-1486], 12 L. Ed. 2d, at pp. 646-47. The reason is that a court cannot fairly assume the people would have intended the one house to survive as the lone repository of the legislative power ” .
VI
GERRYMANDERINg and division and distribution or convenience, CONTIGUITY AND COMPACTNESS
The New York State constitutional provisions require, in section 4 of article III, that Senate districts, upon due reapportionment, “shall be so readjusted or altered that each senate district shall contain as nearly as may be an equal number of inhabitants, excluding aliens, and be in as compact form as practicable * * * and shall at all times consist of con *639 tiguous territory, and no county shall be divided in the formation of a senate district except to make two or more senate districts wholly in such county. No town, except a town having more than a full ratio of apportionment * # * shall be divided in the formation of senate districts; nor shall any district contain a greater excess in population over an adjoining district in the same county, than the population of a town or block therein adjoining such district. Counties, towns or blocks which, from their location, may be included in either of two districts, shall be so placed as to make said districts most nearly equal in number of inhabitants, excluding aliens.”
Section 5 of article III provides that: ‘ ‘ assembly districts [shall be] as nearly equal in number of inhabitants, excluding aliens, as may be, of convenient and contiguous territory in as compact form as practicable, each of which shall be wholly within a senate district formed under the same apportionment * * ®. No town, except a town having more than a ratio of apportionment and one-half over * * * shall be divided in the formation of assembly districts, nor shall any districts contain a greater excess in population over an adjoining district in the same senate district, than the population of a town or block therein adjoining such assembly district. Towns or blocks which, from their location may be included in either of two districts, shall be so placed as to make said districts most nearly equal in number of inhabitants, excluding aliens ’ ’.
In Reynolds v. Sims (377 U. S. 533, 578-579, supra) the Supreme Court of the United States, speaking through the Chief Justice, made it clear that, in a State plan of apportionment, to be constitutional from a Federal point of view, “ the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State ”.
The provisions of the State Constitution forbidding division of counties and towns into any legislative district (except as therein otherwise provided) and requiring contiguity and convenience and that the districts be in as compact form as practicable survive the condemnation of the ruling of the United States Supreme Court in Lomenso (supra) in support of the “ one person — one vote ” * principle.
Indeed, the Court in Reynolds v. Sims (supra) recognized that “ A state may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and pro *640 vide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims” and “Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering.” And the court further said that, by 1 ‘ holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable ” (Reynolds v. Sims, 377 U. S. 533, supra, pp. 577, 578-579; emphasis supplied).
The Court of Appeals of Hew York, in several pronouncements, has also made it abundantly clear that the mandates of the State Constitution — as to the convenience and contiguity of a legislative district, and that it must be “in as compact form as practicable”- — do not permit of personal or political partisanship in any proper reapportionment plan. Thus, in Matter of Dowling (219 N. Y. 44, 58) Judge Chase, for the court, pointed out.that the constitutional directive “permits of a consideration in good faith of existing lines, topography, means of transportation, etc.” (Emphasis supplied.) And, in Matter of Richardson (Stark) (307 N. Y. 269, 275) Chief Judge Lewis, on behalf of the majority, said: “In the absence of proof before the court at Special Term that the reapportionment here challenged was — as alleged in the petition and denied by the respondents in their answers —1 arbitrary and based on personal and political considerations and not on the convenience of the voters * * # or any factor relating to the public interest, and the lines thereof were drawn with the purpose of assuring the continuous election of the candidates of one particular political party and the control of such respective districts by particular political leaders ’; and in the absence of proof that territory within the Assembly districts as reapportioned is not convenient, contiguous and in as compact form as practicable, we conclude, in the circumstances disclosed by this re.cord, that there was no basis, sufficient in law, to support the order made at Special Term.”
In a dissent (in which he was joined in part by Judge Yah Vooehis), Judge Fuld stated that it “ has long been settled that the courts have a duty to see that the act of apportionment or reapportionment, the formation of senate or assembly districts, does not conflict with any mandate of the Constitution” and he made it clear that, in his view, “ gerrymandering ” is “proscribed” by the State Constitution (p. 275).
*641 The issues which divided the court in Richardson were not whether the utilization of the process of reapportionment for the purpose of maximizing political power or maintaining personal position was permissible under the State Constitution, but (1) whether there were established in that case districts which were not “convenient”, that were not “contiguous”, and which were not “ in as compact form as practicable ”, and (2) whether the burden, in the circumstances of that case, was upon the petitioners of “ establishing that the reapportionment accomplished by the respondents is unconstitutional” (Matter of Richardson [Stark], 307 N. Y. 269, 273, supra, Lewis, Ch. J.), or whether it ‘1 was incumbent upon respondents, the public officials responsible for the creation of the districts and the only parties conversant with the facts and the reasons, if any, for the sort of districting effected, to come forward with some reasonable explanation for the character of the districts and show, if possible, that they were 1 in as compact form as practicable’”, since, as the dissenting Judge examined the maps in that case, the “ Petitioners met the burden of proof imposed upon them once it appeared that the districts were so irregularly and grotesquely shaped, so rambling in character, as to lack all semblance of compactness ” (p. 276, Fuld, J.).
The inference is plain from the language of the opinions — at least, as I read them — that, had there been proof of the motivating factors indicated in Richardson, the Court of Appeals would not have approved the apportionment there attacked.
Before, therefore, I proceed to a consideration of some of the principal lines of the districting and apportioning challenged by the petitioners, I shall point out several isolated, but significant, factors — which do not involve an examination of the maps of the 62 counties (and the 65 Senatorial and the 165 Assembly districts) throughout the State — which support the allegations of the petitioners to the effect that open and unabashed partisan gerrymandering was a fundamental purpose and an accomplished fact of the apportionment statutes enacted in December, 1964.* Let me here note some of them:
*642 (A)

All Deliberate Speed or Every Deliberate Need

The respondents contend that immediate action was necessary on the part of the State officials and the State Legislature in order to comply with the deadlines established by the Federal courts. They point out that the United States District Court, by order dated July 27,1964 (as hereinbefore set forth), required that ‘ ‘ not later than April 1, 1965, the Legislature shall have enacted into law a valid apportionment scheme that is in compliance with the XIY Amendment of the United States Constitution and which shall be implemented so as to effect the election of Members of the Legislature at the election in November, 1965.” Thus it was, say the respondents, that — since the Legislature would not meet in regular session until January, 1965 — it was necessary to call a special session in 1964, and to take effective action at such session.
The answer to this contention is a simple statement of the record facts:
The District Court had fixed April 1, 1965, as the deadline date for a specific purpose. To use that court’s own language: ‘ ‘ we gave the Legislature sufficient time to reapportion during a regular session ” (WMCA v. Lomenzo, 238 F. Supp. 916, 9-21, supra, emphasis supplied). The date so fixed was, reasonably enough, deemed by the respondents, representing the State of New York, to give the State insufficient time within which to comply with the District Court order. Therefore, on October 19,1964 — prior, of course, to the election to be held the following month — the respondents in the Lomenzo case (supra) filed a jurisdictional statement asking the United States Supreme Court to modify the District Court order insofar as it directed legislative reapportionment by April 1,1965, and an election pursuant thereto in November, 1965. However, after the election in 1964, the respondents applied to the United States Supreme Court for leave to withdraw their appeal, and permission was granted accordingly on January 22,1965.
The reason for that withdrawal — resulting in the deadline date being frozen (unless application for a change may still and will be made to the United States District Court or the United States Supreme Court) —may have been that the Legislature had in December, 1964, been called into extraordinary session, had studied the Report of the Citizen's’ Committee on Reapportionment dated December 1,1964, had studied the Report of the Joint Legislative Committee on Reapportionment dated Decern *643 her 15, 1964, and had enacted the 1964 Reapportionment Compliance Act and the four amendatory statutes substituting three other and different apportionment schemes. Or the reason may have been that the election in 1964 resulted in a critical situation of considerable consequence: control of the Legislature had been removed by the electorate from the then dominant political party and placed in the new majority. And that, when the respondents did not seek by way of appeal or otherwise an extension of time within which to comply, their “ overriding objective ” was not a “ consideration in good faith ” of the establishment of the principle in this State of an effective £ ‘ equal vote for every voter ”, but rather the partisan advantage of the political party of which the respondents are the leaders and spokesmen.
I have hereinbefore held that a special session of the Legislature was not — qua special session — interdicted by the State Constitution insofar as the adoption of a proper reapportionment statute is concerned. Here, at this point of my consideration of the issues, something new is added, and the question is now presented, whether, instead of proceeding — in this matter of recognized grave importance to the people of this State — with “all deliberate speed” (Virginia v. West Virginia, 222 U. S. 17, 19-20; Brown v. Board of Educ., 349 U. S. 294, 301) and in a spirit of obedience to the valid mandates of the State Constitution, the respondents decided, for reasons of political partisanship, to proceed with what was deemed by them, at least, to be very deliberate need. Proof of the fact in that regard may, I think, properly be ruled a factor by the trier of the facts in determining the question whether the reapportionment and redistricting here challenged were undertaken and adopted in good faith, in compliance with the directive of the United States courts.
(B)

A Letter to a Constituent

The Honorable MacHeil Mitchell, a long-time chairman of the important Senate Judiciary Committee of this State, and the Republican leader in the Greenwich Village area, participated in the deliberations which brought about the drawing of the new district lines and worked with the Joint Legislative Committee on Reapportionment. He is said to have stated in writing that £ £ all of us were certainly concerned with the hope that we could achieve some adequate representation for the Republican voters in this [Hew York] County who in 1962 polled 42% of the vote *644 in our Borough. We had to see that the Districts were equal in size and, wherever it was necessary, to project the lines of the Districts into new territory. Our sole consideration, in that respect, was how best to serve the interests of those who were enrolled within our Party ” (emphasis added).
In addition, the charge is made that statements to the public press by this legislator confirm and substantiate the ‘ ‘ admission against interest ”. These, of course, cannot be and are not taken as evidence. But the proved and undisputed statement in his letter — without explanation from him — cannot be ignored as a matter of prima facie consideration.
The letter is dated January 13, 1965, after the legislator’s term of office had expired, and after the enactment of the challenged statutes for which, it is alleged, he worked and voted. That (contrary to the petitioners’ contention) would render the letter per se incompetent as initial substantive evidence as to the purpose or motive of the other officials and legislators, who are said to have planned together to gerrymander the districts for their political and personal benefit. As said by Chief Judge Lewis for the court in People v. Marshall (306 N. Y. 223, 226) quoting from People v. Ryan (263 N. Y. 298, 305): “ ‘ Declarations made by one conspirator in the prosecution of the enterprise are evidence against all, but they must be made in furtherance of the enterprise and while the enterprise is pending. Narration of past facts after the enterprise has come to an end by success or failure is not admissible in evidence against the others ’ ”.
Thus, while the admissions of one conspirator, made after the common design has been accomplished, are inadmissible against the others, they are, in my view, a just basis upon which to hold that a hearing is both warranted and required for the taking of proof on the subject. For, as stated in People v. Ryan (supra) and People v. Marshall (supra), the acts and declarations of each conspirator in furtherance of the common object and while the enterprise is pending are competent evidence against all (see, also, People v. Connolly, 253 N. Y. 330, 340).
The respondents argue strenuously that the motivation of the Legislature, in enacting the 1964 reapportionment statutes, is not properly a matter for consideration by the court. I do not agree.
In my view, the Court of Appeals, in Matter of Richardson (Stark) (supra), quite clearly indicated the propriety of consideration by the court of the question whether this apportionment is, as was alleged in the petition in that case, and here in sub *645 stance, 1 ‘ ‘ arbitrary and based on personal and political considerations and not on the convenience of the voters * * * or any factor relating to the public interest, and the lines thereof were drawn with the purpose of assuring the continuous election of the candidates of one particular political party and the control of such respective districts by particular political leaders ’ ”. (307 N. Y. 269, 275.) The respondents urge that the court’s statement was dictum. That is not my thought. But, be that as it may, the court’s expression is of significance, for it was at least in part due to the absence of proof on this question that the Appellate Division reversal of Special Term was affirmed (see 284 App. Div. 344, affd. 307 N. Y. 269).
A number of years earlier, in 1916, the Court of Appeals, per Chase, J., had said: “ The constitutional provision does not provide unqualifiedly for compactness. * * * It is expressly provided that the districts shall be as compact as practicable. This permits of a consideration in good faith, of existing lines, topography, means of transportation, etc.” (First emphasis in original; second supplied; Matter of Dowling, 219 N. Y. 44, 58.) It is to be noted that the element of “ good faith ”, as a part of legislative ‘1 consideration ’ ’ of apportionment matters, is essential to Judge Chase’s statement.
The respondents contend that Matter of Delmar Box Co. (Ætna Ins. Co.) (309 N. Y. 60, 67 [1955]), removes this question from my consideration. It was there said by the court: “ Reliance is placed upon the views expressed by the assemblyman who introduced the bill in 1952, but those views cannot serve as a reliable index to the intention of the legislators who passed the bill. It is sufficient to note that they were stated, not in the course of debate on the floor of the legislature, but in a memorandum submitted to the governor after the passage of the bill, and there is no showing that the other legislators were aware of the broad scope apparently intended for the bill by its sponsor.”
The above quotation contains within it the refutation of the point for which the respondents cite the case. It is clear that Delmar involved construction of a statute for the purpose of determining the scope of its application. The question before me, however, is not the intent of the Legislature as to construction of a statute but, rather, as to the statute itself: Why the statute says what it does, not what does it mean and how to apply what it says. Similarly, Matter of Board of Higher Educ. v. Garter (14 N Y 2d 138,150 [1964]), also cited by the respondents, deals with the scope and application of a statute and is not relevant here.
*646 In support of the contention that this question should not be considered by me, the respondents quote Judge Cabdozo’s opinion in Bacon v. Miller (247 N. Y. 311) where he states, at pages 318-319: “ With the motives which actuated the Board of Aider-men, we have nothing to do at all events in the absence of fraud or corruption,”
While the present is not a case of “ fraud or corruption”, it is a matter of whether there was “ good faith” — that is, the purpose of, and basis for, the specific provisions of the enactments. Intent to gerrymander is, therefore, quite admissible, if proved. In that aspect, the issue of motive is properly before the court.
(0)

The Partisan Political Gerrymander and the United States

Constitution

It has been urged by some of the petitioners and amici that there is before me for disposition the question as to whether — in the light of the decisions of the United States Supreme Court in Reynolds v. Sims (supra), in Lomenzo (supra) and in the related cases — the partisan gerrymander said to have been perpetrated by the December, 1964 session of the State Legislature was forbidden by the United 'States Constitution, in that there is (by virtue of the necessary impact upon the political strength of the districts) a definite and intentional dilution and debasement of the individual’s right of franchise and the weight and value of his vote, and thus a violation of the equal protection clause, with as much constitutional consequence as the urban-rural controversy which gave rise to the decision in Lomenso (supra).
The respondents deny the existence of an appropriate Federal constitutional question as to this issue, and reply further, that, in any event, the issue should not be resolved here, but should be relegated to the United States District Court which has retained jurisdiction.
Whether or not the latter ground is a proper basis for judicial restraint on my part, it is not necessary now to determine. I do, however, note that, in my view, a State court Judge is as obligated to support the Constitution of the United States as is a Federal Judge. I do not subscribe to the principle that it is my function to sustain tho Constitution of New York and the function of my learned colleague across tho street to protect the sanctity of the Constitution of the Nation. This is not a question of the injunction to “ Render therefore unto Caesar the things which are Caesar’s; and unto God the things that are *647 God’s.” (The Gospel according to Saint Matthew XXII, 21; see, also, Saint Mark, XII, 17.) Both of us — United 'States and New York State Judges alike — have an equal duty in respect of the Constitution of the United States, although I have the added responsibility of preserving and defending the Constitution of this State as well.
But I need not, at this time, hold one way or the other on the merits of the substance of this “ troublesome problem ” (McKay, Reapportionment Decisions: Retrospect and Prospect, 51 American Bar Association Journal 128, 132; see, also, Auerbach, Reapportionment Gases: One Person, One Vote' — One Vote, One Value, in The Supreme Court Review 1964, Law School of Univ. of Chicago, 1, 64). For the use of the gerrymander is, in essence, forbidden by the State Constitution; and, thus, it is certainly a State matter, and, troublesome or not, this court may not escape it. As has been seen earlier in this opinion, the Constitution of New York State explicitly imposes upon this court the responsibility of undertaking to “review” “ [a]n apportionment by the legislature, or other body” (art. Ill, § 5, last par.), and even the Legislature itself cast that duty upon this court (L. 1911, eh. 773, § 1, incorporated in section 4221 of chapter 9 of title 13 of McKinney’s Unconsolidated Laws).
There is thus no question here of this court penetrating the “ political thicket ” which Mr. Justice Frankfurter unsuccessfully warned his colleagues on the United States Supreme Court not to enter (Colegrove v. Green, 328 U. S. 549, 556 [1946]; Baker v. Carr, 369 U. S. 186, 266-330 [1962]). The People of this State, through their Constitution, and the Legislature, by its enactment of long ago, have placed this court there,
(D)
Issues of Fact as to Several Districts CPLR 409 (subd. [b]) provides that: “ The court [in a special proceeding] shall make a summary determination upon the pleadings, papers and admissions to the extent that no triable issues of fact are raised. The court may make any orders permitted on a motion for summary judgment.”
CPLR 3212, in respect of the procedure for accelerated judgment, permits of total or partial summary judgment and severance and limitation of issues of fact for trial.
The parties here stipulated — and I have heretofore signed an intermediate order in conformance therewith — that all of the documents filed with me (both prior to and after I denied, *648 on. the oral argument, the respondents’ motions to dismiss the petitions) may be considered by me for the same purpose.
On this aspect of the case, there are before me, at the present stage of these proceedings, the motions to dismiss as a matter of law, in that, upon all the proof presented — by way of petition, affidavit, document, concession and stipulation — the case is so clear in their favor, that there is no need for a trial. The motions are denied.
In so deciding, it is not necessary for me to find as an established fact that there have been partisan and personal considerations involved in the enactment of the Reapportionment Compliance Act and that some of the districts created have substantially deviated from the convenient, contiguous or compact requirements, or that there have been violations of the county, town and block rules laid down in the State Constitution, to an extent not necessitated by the mandates of the Federal courts.
On the other hand, I deny the application for summary judgment in their favor made by the petitioners. For the “ constitutional provision does not provide unqualifiedly for compactness. Senatorial districts are not required to be in the form of geometric figures, as a square or perhaps a circle. Such a provision would be impractical and impossible to carry out. It is expressly provided that the districts shall be as compact as practicable. This permits of a consideration in good faith of existing lines, topography, means of transportation, etc.” (Matter of Dowlvng, 219 N. Y. 44, 58 [1916], supra [Chase, J.], emphasis in original.)
“ While some of .the districts in the counties named may be subject to criticism with respect to compactness, we are unable to say from a mere inspection of the maps that the constitutional provision in regard to compactness has been violated. ’’ (Matter of Dowling, 219 N. Y. 44, 59 [1916], supra [Chase, J.], emphasis supplied.)
Had I not already concluded that the statutes challenged in these proceedings are invalid as a matter of express and specific State constitutional law, for the reasons hereinbefore set forth, I would at this point undertake the resolution of the mass of statistical and cartographic information presented to and studied by me, so as to limit as many of the issues as possible upon a subsequent hearing, if any be held.
Under the circumstances, however — and particularly the need for expedition — I shall confine myself here to a listing of the challenged districts and to a discussion of several specific instances,
*649 The challenged Assembly Districts established by the new apportionment statute are:
County Assembly District No.
Suffolk.....................................1, 2, 3, 4, 5, 6
Suffolk, Nassau ..................................:......7
Nassau...................................... 13, 14, 15, 20
Queens.................■....... 22, 24, 29, 30, 31, 32, 36, 37
Kings .... 42, 43, 45, 46, 49, 51, 52, 53, 54, 56, 58, 59, 61, 62
Kings, Richmond................................... 63
New York..................... 67, 68, 69, 70, 77, 78, 79, 80
Bronx ............................... 82, 83,-84, 85/92, 93
Westchester .................... 96, 97, 98, 99, 100, 101,102
Rockland, Orange................................ 105
Orange ............................................... 106
Putnam, Dutchess ..................................... 107
Dutchess ............................................. 108
Ulster................................................ 109
Sullivan, Ulster, Orange................................ 110
Albany........................................... 112, 113
Rensselaer............................................ 114
Washington, Rensselaer................................ 115
Albany, Schenectady................................... 116
Schenectady .......................................... 117
Warren, Essex, Clinton, Franklin....................... 119
Clinton, Franklin...................................... 120
Herkimer, Hamilton, Fulton............................ 122
Montgomery, Schoharie, Fulton......................... 123
Broome............................................... 126
Chenango, Cortland, Broome............................ 127
Madison, Oneida....................................... 128
Oneida ............................................... 129
Lewis, Jefferson....................................... 131
Oneida, Jefferson, Oswego.............................. 132
Onondaga ............................... 133, 134, 135, 136
Cayuga, Oswego, Tompkins............................. 137
Tioga, Tompkins ...................................... 138
Monroe ......................... 143, 144, 145, 146,147, 148
Niagara.......................................... 151, 152
Erie, Niagara......................................... 153
Erie.............155, 156, 157, 158, 159, 160, 161, 162, 163
Chautauqua, Cattaraugus.......................... 164, 165
Thus, 103 of 165 Assembly Districts, or more than 60% of the
total, are under attack.
*650 The challenged Senate Districts are:
County Senate District No.
Suffolk................................:.............. 1, 2
Suffolk, Nassau.......................................... 3
Nassau ....................................... 4, 5, 6, 7, 8
Nassau, Queens.......................................... 9
Queens ......................................... 10, 11, 14
Queens, Kings.......................................... 15
Kings ............................ 16, 17, 18, 19, 20, 21, 24
Richmond, Kings................................. 26
New York............................ 27, 28, 29, 30, 31, 32
New York, Bronx....................................... 33
Bronx ................................... 34, 35, 36, 37, 38
Westchester..................................... 39, 40, 41
Rockland, Orange................................ 42
Greene, Sullivan, Ulster, Orange....................... 43
Albany ................................................ 45
Rensselaer, Warren, Washington, Albany.................. 47
Clinton, Essex, Franklin, Hamilton, St. Lawrence.......... 48
Chenango, Delaware, Fulton, Montgomery, Otsego.......... 49
Onondaga, Madison................................. 52, 53
Wayne, Monroe ........................................ 57
Ontario, Monroe.................................... 58
Livingston, Genesee, Monroe....................... 59
Erie ........................................ 61, 62, 63, 64
Thus, 51 of 65 Senate Districts, almost 80% of the total, are under attack.
In a great majority of the instances in which an Assembly or Senatorial District has been challenged, the respondents have contended that it has a ‘ ‘ rational basis ’ ’ and that any deviation from the specifications of the State Constitution and from the principle of contiguity, compactness and convenience are due to the necessity of compliance with the Federal mandate.
I shall now proceed to a short resumé as to several particular districts attacked.
(E)
The Twenty-Eighth Senatorial District (New Yorlc County) Under The Deapportionment Compliance Act
The Republican candidate for re-election in November, 1964 defeated in the then prescribed 20th Senatorial District. By virtue of the adoption in December, 1964 of chapter 976, *651 certain election districts therein were excluded from the 28th Senatorial District, from which presumably the then Republican incumbent will be a candidate in the forthcoming election in November, 1965. The total vote cast in the excluded election districts in the 1964 election was Republican 12,902; Democrats 16,303; Liberals 3,089. Thus, there was a Democratic-Liberal plurality in the area involved of 6,490. The plurality in these districts by which the incumbent was defeated was 6,146. It is asserted by the petitioners, and appears to be the fact prima facie, that, by creating the new 28th Senatorial District, the Republican-controlled Legislature simply eliminated this opposing plurality.
(P)

The Thirty-Eighth Senatorial District (Bronx County) Under the Reapportionment Compliance Act

The area north of Gun Hill Road should not, it is contended by the petitioners, have been included in the new 38th Senatorial District, and three areas on the periphery should be within the district. The petitioners point out that most of these three areas were removed from the old 29th Senatorial District and placed in the new 38th 'Senatorial District and that the result was a net gain of more than 8,500 votes for that political party which controlled the extraordinary session and which enacted chapter 976 and thereby created the 38th Senatorial District. The petitioners point out, further, that the exchange they propose would result in an area considerably more compact and contiguous. An attempted detailed rebuttal of the claim is contained in the respondents’ papers.
The figures and analysis presented in the affidavits relied upon by the petitioners clearly establish a prima facie case of gerrymandering. But, they cannot, in view of the denials and defenses, warrant a disposition as a matter of law. A finding of fact is in order in regard to this issue, and a hearing must be held thereon in order to resolve it.
(G)

Monroe County Assembly Districts under the Reapportionrnent Compliance Act

The statistics and maps of the City of Rochester and the County of Monroe, as analyzed in the petitioners’ papers, raise a colorable claim that, in the formation of Assembly Districts *652 143 through 148, the requirement of contiguity and compactness was not observed to the fullest extent permitted under the mandate of the Federal courts.
The respondents “ deny the accuracy of the figures and maps tendered by ’ ’ the petitioners via the affidavits prepared by Lamb as amicus curice and adopted by the petitioners herein; and the analysis and conclusions therein contained are also refuted.
The respondents further argue that there is no issue of partisanship presented here because the districts involved are neither more irregular nor longer than those proposed by the Democratic plaintiffs in the United States District Court in WMC v. Lomenzo (238 F. Supp. 916, supra).
I do not subscribe to the view that the petitioners in the proceedings before me are bound by the position which may have been taken by Straus and WMCA, Inc., as plaintiffs in the Lomenzo case. Moreover, the latter are involved in the present proceedings solely in the capacity of amici curiæ.
As indicated above, I find a prima facie case to exist in regard to the stated Assembly Districts.
(H)

The 148th Assembly District (Monroe and Orleans Counties) and

153rd Assembly District (Erie and Niagara Counties) Under the Reapportionment Compliance Act

While the 148th Assembly District established by the Reapportionment Compliance Act is composed of contiguous territory, it is far from compact. Running 43.2 miles from one end to the other, the district contains a small slice of the City of Rochester (of Monroe County) as its easternmost portion. It proceeds westward through the Towns of Greece, Parma and Hamlin, all in Monroe County, and then continues into adjacent Orleans County for approximately 24 miles.
The petitioner’s papers state that, in this new district, only 13% of the voters would be within the Rochester city limits, that 57% would be in the adjacent towns in Monroe County, and that the Orleans County portion would contain 30% of the voters. The allegations as to these figures are presumably included in the general denial interposed by the respondents; but they have brought no specific figures to the contrary to my attention.
Now, let us compare this with the 153rd Assembly District. Glancing at the maps, this newly-created district strikes one as *653 being a glaring example of noncontiguity. The Tonawanda Indian Reservation, included therein, is not adjacent to any other portion of that district and is, indeed, removed from it by the three Towns of Amherst, Clarence and Newstead, which are in the 155th or 162nd Assembly Districts. The shortest distance between the nearest portion of the 153rd Assembly District and the Tonawanda Reservation is approximately 18 miles, and the 155th and 162nd Districts intervene between.
The respondents do not truly deny this point, but seek to minimize it from the point of view of the paucity of votes involved; and argue that it is a draftsman’s error or statutory ambiguity which can be corrected by the Secretary of State in pursuance of section 403 of chapter 976, and that in any event it does not affect the substance of the reapportionment plan.
The situation may really be a minuscule one. I have not been informed of any action taken by the Secretary of State. Whether there is herein any such appropriate action to be had may raise the question of how this condition was caused or happened to exist and the question also of the application of section 403, which authorizes the Secretary of State to promulgate orders to correct “ omissions, overlaps, erroneous nomenclature, or other defects in the description of districts so as to accomplish the purposes and objectives of this act.” And, further, the issue arises whether or not the Legislature may properly delegate such authority to the Secretary of State, in the light of subdivision 2 of section 403, which establishes the guidelines which he is to observe. If, after the hearing, there are findings of fact within the purview of section 403, there will be time enough to resolve the legal questions raised.
(I)
The State Constitutional Requirement as to Division of Counties and Towns and the “ County, Town and Bloch ” Rules
The papers in this proceeding, and the minutes of the argument before me, are replete with allegations of violations of the State constitutional provisions regarding division of counties and towns and the requirement of the placement of counties, towns and blocks within districts so as to produce districts most nearly equal in population, including the prohibition of population variances between adjoining districts greater than the citizen population of a town or block on the common border. Here, too, as with the issue of convenience, contiguity and compactness, findings of fact are necessary, and a hearing *654 should be had for such purpose. The papers submitted are not sufficient on which to base a resolution of the questions of whether the constitutional mandates have been observed and where they have not, if that be the case, whether nonobservance was necessary in order to comply with the mandate of the Federal courts.
(J)

Nassau County

I-t is asserted by the petitioner, adopting the allegations of an amicus; (1) that the Town of North Hempstead has been divided in the creation of Senate Districts 3 through 8; (2) that errors and ambiguities exist in the descriptions of the 14th and 15th Assembly Districts; and (3) the 13th, 19th and 20th Assembly Districts and the 6th and 7th Senate Districts cannot be completed as described in the statute.
The petitioner’s exhibits contain the further allegations that a three-mile wide portion of the Town of Oyster Bay was split vertically between Assembly districts, in the course of dividing that town among 5 Assembly districts, all for the purpose of obtaining partisan political advantage.
It is further alleged by the petitioner that the 14th Assembly District was gerrymandered by the splitting of Rockville Centre and Freeport, two large incorporated villages, in order to place the residences of two Democratic Assemblymen therein and to strengthen the Republican voting tendencies of the 19th Assembly District, where an incumbent Republican Assemblyman resides. And, again, that other villages and communities were split in creating other Assembly districts.
It is charged by the petitioner that Senatorial district lines have been drawn by the Legislature in complete disregard of any relationship between Assembly and Senate lines.
The respondents’ reply to these allegations is that the challenged districts are contiguous and compact and, further, are rational and in compliance with elementary considerations of good districting, and that the allegations as to legislative motive are demonstrably false; that, wherever villages have been divided, it was in order to follow the lines of the town, the superior local government; that there is no. overwhelming difficulty in completion of the districts attacked on that ground, and that the powers of the Secretary of State under section 403 are adequate to resolve any actual problems of this nature.
The petitioner Orans has proposed an alternative districting plan. The real purpose there (the respondents contend) is the *655 joining of areas of Democratic party voting strength. There is no doubt in my mind that the existence of other districting possibilities does not render unconstitutional the districts created by the legislation here involved. Much depends, it appears, upon whose plan is under attack, that is, upon whose political ox is 'being gored.
All of the foregoing, expressed in a somewhat undetailed fashion, leads me to hold here (as in other situations), that the questions posed about Nassau County cannot be resolved without a hearing.
CONCLUSION
The upshot of my views is that the requirements as to contiguousness, convenience and compactness and the various rules as to counties, towns and blocks do not lend themselves readily to testing as a visual, geographical or statistical matter alone and should he coupled with the principle that they are to be deemed, in this aspect of the case, an antigerrymander safeguard. On the basis of what I have outlined hereinabove, the petitioners have presented a prima facie case on this score, and a hearing on such factual issues should be had.
'Since I have concluded that the legislation is unconstitutional as a matter of law, there is no need to have that hearing until there is a determination of the appeals in the United States Supreme Court from the order of the United States District Court in WMCA v. Lomenzo (238 P. Supp. 916, supra) and until there is a determination by the New York Court of Appeals of the appeal which will undoubtedly be taken from my decision.
Settle one order and judgment accordingly, reciting all the papers submitted in both proceedings.

 A regular session is one which convenes in compliance with the mandate of section 4 of article XIII of the Constitution of the State of New York, which provides that: “ The political year and legislative term shall begin on the first day of January; and the legislature shall, every year, assemble on the first Wednesday after the first Monday in January.”
An extraordinary (or special) session, on the other hand, is convened by the Governor, under the authority of section 3 of article IV of the Constitution of the State of New York, which states, inter alia, that the Governor “shall have power to convene the legislature, or the senate only, on extraordinary occasions. At extraordinary sessions no subject shall be acted upon, except such as the governor may recommend for consideration.”

Gray v. Sanders, 372 U. S. 368, 381, quoted in Reynolds v. Sims, 377 U. S. 533, 558, 587, 588, 593.

 There are a number of methods of apportionment. That this is so is made plain by the fact that the Legislature adopted four different plans in one session. There may be others (see Silva, Apportionment of the New York Assembly, 31 Fordham L. Rev., 1-71 [1962-1963]).
Apportionment and districting — within the framework of the XIY Amendment of the United States Constitution and article III of the State Constitution — are primarily and fundamentally a legislative function. Good, faith on the part of the Legislature — whatever its political majority — will keep it there.