40 N.Y.2d 731 (1976)
Flushing National Bank, on Behalf of Itself and All Other Holders of Notes of the City of New York Maturing on or before June 30, 1976, Appellant,
v.
Municipal Assistance Corporation for the City of New York et al., Respondents, et al., Defendant.
Court of Appeals of the State of New York.
Argued September 7, 1976.
Decided November 19, 1976.
Arthur Richenthal, New York City, for appellant.
Simon H. Rifkind, Robert L. Laufer, Dean B. Allison, Howard S. Veisz and Jonathan Siegfried, New York City, for Municipal Assistance Corporation for the City of New York, respondent.
W. Bernard Richland, Corporation Counsel (James G. Greilsheimer, L. Kevin Sheridan, Leonard Koerner and James Griffin, New York City, for the City of New York and another, respondents.
Louis J. Lefkowitz, Attorney-General (Shirley Adelson Siegel and Samuel Hirshowitz of counsel), Albany, for New York State Emergency Financial Control Board, respondent.
Judges JASEN, GABRIELLI, JONES and WACHTLER concur with Chief Judge BREITEL; Judge COOKE dissents and votes to affirm in a separate opinion; Judge FUCHSBERG taking no part.
*732 Chief Judge BREITEL.
This is an action by a holder of New York City short-term anticipation notes to declare unconstitutional the New York State Emergency Moratorium Act for the City of New York (L 1975, ch 874, as amd by ch 875). Special Term and the Appellate Division held the act constitutional under both the Federal and State Constitutions.
There should be a reversal. The act violates the State Constitution in denying faith and credit to the short-term anticipation notes of the city. The State Constitution prohibits the city from contracting any indebtedness unless it pledges its "faith and credit" for the payment of the principal of the indebtedness (NY Const, art VIII, § 2). Thus, the Moratorium Act, by depriving short-term noteholders of judicial remedies for at least three years, makes meaningless the verbal pledge *733 of faith and credit. On this view the Federal questions need not be reached.
On November 13, 1975, because of the city's desperate fiscal paralysis, the Legislature, in Extraordinary Session, passed, and the next day the Governor approved, the New York City Emergency Moratorium Act (L 1975, ch 874, as amd by ch 875). The act imposes a three-year moratorium on actions to enforce the city's outstanding short-term obligations, namely, tax anticipation notes (TANS), bond anticipation notes (BANS), revenue anticipation notes (RANS), budget notes, and urban renewal notes (URNS). The act provides that the moratorium will be effective only with respect to those noteholders who have been offered, and have declined, an opportunity "voluntarily" to exchange their notes for an equal principal amount of long-term bonds issued by the Municipal Assistance Corporation for the City of New York (MAC). The act also provides that during the moratorium the noteholders who have declined to exchange their notes for MAC bonds are to be paid interest at an annual rate of at least 6%. (§ 5.)
MAC is an intermediate finance agency created to assist the city in its financial stringency (L 1975, ch 169). Neither the faith and credit of the State nor of the city is pledged to the obligations of MAC, but only certain revenues which the city may raise or receive from the State (L 1975, ch 169, § 1, and Governor's memorandum on approval dated June 10, 1975, McKinney's 1975 Session Laws of NY, at pp 1744-1745; Public Authorities Law, § 3036; see Wein v State of New York, 39 N.Y.2d 136, 154 [dissenting opn]; cf. Wein v City of New York, 36 N.Y.2d 610, 618).
After defining the moratorium period as three years from the effective date of the act (§ 2, subd 3), the core moratorium provisions read as follows:
"§ 3. Enforcement of judgments and liens on account of short-term obligations suspended.
"During the moratorium period, and notwithstanding any inconsistent provisions of any law, general, special or local, or of any agreement or short-term obligation, no act shall be done, and no action or special proceeding shall be commenced or continued in any court in any jurisdiction, seeking to apply or enforce against the city, or any political subdivision, agency, instrumentality or officer thereof, or their funds, property, receivables or revenues, any order, judgment, lien, set-off or counterclaim on account of any short-term obligation, *734 or the indebtedness or liability evidenced thereby, or seeking the assessment, levy or collection of taxes by or for the city or the application of any funds, property, receivables or revenues of the city on account of any such short-term obligation, or the indebtedness or liability evidenced thereby, although the payment of such short-term obligation may be due by the terms thereof or any general or special or local law or agreement.
"§ 4. Actions upon short-term obligations suspended.
"During the moratorium period, and notwithstanding any inconsistent provisions of any law, general, special or local, or of any agreement or short-term obligation, no action or special proceeding shall be commenced or continued upon any short-term obligation, or the indebtedness or liability evidenced thereby, although the payment of such short-term obligation may be due by the terms thereof or any general or special or local law or agreement."
On November 14, 1975, the effective date of the Moratorium Act, approximately $5 billion in city notes were outstanding and were scheduled to mature within the following 12 months. Of the $5 billion in notes, about $2.1 billion were held by MAC, $250 million were held by the State, and $1.049 billion were held by 11 New York clearing house banks and various city employees' pension and bond sinking funds. At about the same time, the clearing house banks and the city funds agreed to extend their notes to July 1, 1986. After two MAC exchange offers, about $1 billion in notes remain with the public, including plaintiff Flushing National Bank.
The bank contends that, in addition to various infirmities under the Federal Constitution and statues, the Moratorium Act violates State constitutional limitations.
The State Constitution regulates closely the debt-incurring power of local governments. Key to this case is that a city may not contract indebtedness unless it has "pledged its faith and credit for the payment of the principal thereof and the interest thereon" (NY Const, art VIII, § 2).
The faith and credit provision was added in 1938. The words "faith and credit" offer no difficulty in understanding and therefore must be read in accordance with their univocal meaning (e.g., Matter of Sherrill v O'Brien, 188 N.Y. 185, 207; Matter of Tuthill, 163 N.Y. 133, 145). Moreover, the term "faith and credit" in its context is not qualified in any way and the *735 records of the Constitutional Convention of 1938 reveal no analysis of the words, let alone any suggestion of a departure from their evident meaning (see Revised Record, New York State Constitutional Convention of 1938, vol II, at p 1076). It is significant that proposals to eliminate the faith and credit clause have been rejected (Temporary State Commission on Constitutional Convention, Local Finance, at pp 125, 127).
A pledge of the city's faith and credit is both a commitment to pay and a commitment of the city's revenue generating powers to produce the funds to pay. Hence, an obligation containing a pledge of the city's "faith and credit" is secured by a promise both to pay and to use in good faith the city's general revenue powers to produce sufficient funds to pay the principal and interest of the obligation as it becomes due. That is why both words, "faith" and "credit", are used and they are not tautological. That is what the words say and that is what courts have held they mean when rare occasion has suggested comment (State v City of Lakeland, 154 Fla 137, 139; State v County of Citrus, 116 Fla 676, 694; Sacramento Municipal Utility Dist. v Spink, 145 Cal App 2d 568, 576-577; see Rabinowitz, Municipal Bond Finance and Administration, at p 53; cf. Port of N. Y. Auth. v Baker, Watts & Co., 392 F.2d 497, 504). As stated by the Supreme Court of Florida in State v County of Citrus (supra, at p 694): "[T]he effect of such pledge of `full faith and credit' is not to create a general or special lien or charge upon the unspecified revenues, moneys or income of the obligor not therein specifically obligated to the payment of such bonds, but is to acknowledge an indebtedness for the amount of money received as a consideration for the bonds, which indebtedness will become enforceable in an ordinary action, should the special contractual obligation as embraced in the bond itself, fail."
A "faith and credit" obligation is, therefore, entirely different from a "revenue" obligation, which is limited to a pledge of revenues from a designated source or fund (see New York State Temporary Commission on Revision and Simplification of the Constitution, Staff Report No. 35, "Simplifying the Local Finance Article", at pp 27-28; State v City of Lakeland, supra, at pp 139-140). It is also in contrast to a "moral" obligation, which is backed not by a legally enforceable promise to pay but only by a "moral" commitment.
The constitutional requirement of a pledge of the city's faith and credit is not satisfied merely by engraving a statement of *736 the pledge in the text of the obligation. The last is a strange argument made by respondents. It is difficult to understand the financial value of such a commitment as contrasted with a "moral" obligation, wisely prohibited by the Constitution for municipalities (NY Const, art VIII, § 2). Instead, by any test, whether based on realism or sensibility, the city is constitutionally obliged to pay and to use in good faith its revenue powers to produce funds to pay the principal of the notes when due. The effect of the Moratorium Act is, however, to permit the city, having given it, to ignore its pledge of faith and credit to "pay" and to "pay punctually" the notes when due. Thus, the act would enable the city to proceed as if the pledge of faith and credit had never been.
It is argued that the city has insufficient funds to pay the notes and cannot in good faith use its revenue powers to pay the notes. The city has an enormous debt and one that in its entirety, if honored as portions become due, undoubtedly exceeds the city's present capacity to maintain an effective cash flow. But it is not true that any particular indebtedness of the city, let alone the outstanding temporary notes, is responsible for any allocable insufficiency. In short, what has happened is those responsible have made an expedient selection of the temporary noteholders to bear an extraordinary burden. The invidious consequence may not be justified by fugitive recourse to the police power of the State or to any other constitutional power to displace inconvenient but intentionally protective constitutional limitations.
The constitutional prescription of a pledge of faith and credit is designed, among other things, to protect rights vulnerable in the event of difficult economic circumstances. Thus, it is destructive of the constitutional purpose for the Legislature to enact a measure aimed at denying that very protection on the ground that government confronts the difficulties which, in the first instance, were envisioned (see Matter of Board of Educ. v Yonkers Federation of Teachers, 40 N.Y.2d 268, 275). Moreover, in denying access to the courts there is in effect a denial of all remedy. It is elementary that denial of a remedy is a denial of the right (see, e.g., Worthen Co. v Kavanaugh, 295 US 56, 62; cf. Home Bldg. & Loan Assn. v Blaisdell, 290 US 398, 430-434).
It is not only the faith and credit clause of the State Constitution which marks out the constitutional plan for performance of municipal financial obligations. Other parts of *737 article VIII control the debt-incurring or spending power of municipalities and yet also provide exception in order that outstanding debt obligations may be paid (§§ 2-a-6, 7, 7-a, applicable to New York City). Thus, for example, real estate taxes which the city may levy are limited, with certain exceptions, to 2½% of the average full valuation of taxable real estate (§§ 10, 11). The limit, however, may be exceeded to provide for all debt service (§ 10). So, too, although the Legislature is given the duty to restrict municipalities in order to prevent abuses in taxation, assessment, and in contracting of indebtedness, it may not constrict the city's power to levy taxes on real estate for the payment of interest on or principal of indebtedness previously contracted (§ 12). (For a history of the limitations on local indebtedness, see New York State Constitutional Convention Committee [1938], Problems Relating to Taxation and Finance, at ch XIII.)
While phrased in permissive language, these provisions, when read together with the requirement of the pledge of faith and credit, express a constitutional imperative: debt obligations must be paid, even if tax limits be exceeded. A Constitution is no less violated because one would undermine only its prevailing spirit, and, arguably, not its letter (see People ex rel. Burby v Howland, 155 N.Y. 270, 280). However, in this case there is no split; spirit and letter speak in unison.
Thus, it is disingenuous to contend that, since the constitutional language allowing the city to exceed tax limits to pay its indebtedness is in form permissive, it may be disregarded. Similarly disingenuous is the argument that the Legislature has not unconstitutionally restricted the power of the city to levy taxes to pay its indebtedness because the city is "free" under the Moratorium Act to pay the notes if it wishes. The problem is not that, but that the city is free under the questioned legislation not to pay them.
The fourth paragraph of section 2 of article VIII contains an interesting provision which has given rise to a sharp divergence among the respondents. The provision itself and the ensuing divergence confirms, if confirmation be necessary, that the Moratorium Act would boldly override constitutional limitations.
Section 2 provides that "certificates or other evidence of indebtedness issued in anticipation of the collection of taxes or other revenues, or renewals thereof, which are not retired within five years after their date of original issue" must be *738 covered by appropriation by the issuing municipality, and in default of such appropriation, "a sufficient sum shall be set apart from the first revenues thereafter received and shall be applied to such purposes." The matter is not left to discretion, for the section goes on to provide that the fiscal officer of the municipality "may be required to set apart and apply such revenues * * * at the suit of any holder of obligations." Significantly, on oral argument counsel for MAC and the State agreed that the provision is mandatory and beyond valid impairment by the Moratorium Act after five years  a period rapidly approaching its termination. Counsel for the city, for obvious practical reasons, vigorously opposes this view. He would also have this provision rendered unenforceable by the Moratorium Act, which makes no exceptions. He invokes the "police power", an argument of last recourse.
Actually, the presence of the specific remedy against a defaulting municipality, beyond the generality of the faith and credit clause, is conclusive that the Constitution permits no escape for the municipality from performing its obligations. Nor, if it be necessary to say so, is the specific remedy the exclusive one. The Constitution does not say it should be exclusive and no principle of reason or law suggests that specification of a remedy precludes whatever other remedies are available (see People v New York Cent. & Hudson Riv. R. R. Co., 74 N.Y. 302, 307; 56 NY Jur, Statutes, § 275).
The point is that the Moratorium Act, if it were valid, would bar all remedies for a period of three years. For this there is no warrant. And the city's position on the appeal and the discussions publicized in connection with the exchange offers of MAC bonds for the temporary notes make quite clear that the noteholders would have to have a life expectancy of longer than three years if they expect the city voluntarily to redeem the notes. In short, if a three-year moratorium be valid, then one for a longer period should be valid, and perhaps too, one so long until all the noteholders take MAC bonds "voluntarily" in exchange for their notes.
It is not without significance that although Special Term and the Appellate Division treated the many Federal constitutional issues, neither offered any analysis to overcome the crux of the case  the faith and credit clause and its implications. As for the respondents they offer only a chimera.
In sum, to hold, as respondents would have the court do, that the operative effect of the faith and credit clause is *739 exhausted when the indebtedness has been incurred would result in an economic and legal chimera. The only practical significance of a pledge of faith and credit with respect to an indebtedness must be in relation to its payment here on earth and on its due day. To interpret the constitutional provision otherwise would be to honor it as a form of window-dressing but to deny it substantive significance.
In reaching this conclusion, the court has no choice in the performance of its judicial and constitutional function (Birnbaum v New York State Teachers Retirement System, 5 N.Y.2d 1, 11-12). With full awareness of practical consequences, it must apply constitutional policy and law to difficult questions (compare Sgaglione v Levitt, 37 N.Y.2d 507, with Wein v City of New York, 36 N.Y.2d 610, supra, and Wein v State of New York, 39 N.Y.2d 136, supra). Indeed, the kind of analysis used in the Wein cases to sustain parts of the emergency program for New York City would have been unnecessary if incantations of "police power" and "financial emergency" could suspend constitutional provisions. Neither life nor law is that easy.
The dissenting opinion in impressive eloquence portrays the dire straits of the city. The portrait is a correct one, but the duty of this court is to determine constitutional issues which sometimes accommodate and sometimes prohibit the facile and sometimes too facile solution of difficult problems. But it is a Constitution that is being interpreted and as a Constitution it would serve little of its purpose if all that it promised, like the elegantly phrased Constitutions of some totalitarian or dictatorial Nations, was an ideal to be worshipped when not needed and debased when crucial.
Turning to the direct points urged in the dissenting opinion, the discussion of two cases cited by the majority as defining the meaning of faith and credit does not support the dissenting position. Of course, those cases, in holding that the liability of the municipality was not limited to specific revenues, demonstrate further the breadth of obligation of pledging faith and credit (State v City of Lakeland, 154 Fla 137, supra; Sacramento Municipal Utility Dist. v Spink, 145 Cal App 2d 568, supra).
One must agree, too, with the dissenting opinion, that the police power (p 749) "may not be limited or restricted by stipulations in private contracts or in those between private parties and governmental units or agencies." And that the *740 Legislature may not limit the police power. In the first place, the issue in this case does not turn merely on the stipulations of parties to an agreement. In the second place, it does not turn on any statutory command by the Legislature to pledge faith and credit. And, of course, the dissenting opinion (p 754) agrees that the police power may be limited. In short, the police power which may override statutes is not a higher law which transcends Constitutions as well.
The Federal issues are not reached and therefore cases constituting Federal constitutional provisions, especially the impairment clause, cast little light on the State constitutional issues in this case. It is the State Constitution which mandates the certain obligation on the city. It is the State Constitution which commands the municipality to pledge its faith and credit to its debt undertakings, and by inevitable consequence that the documents of undertaking express the pledge. These constitutional provisions are as much a part of the State Constitution as the language from which the police power is implied or the express wording of the so-called emergency clause (art III, § 25).
The invocation of the emergency clause in the State Constitution is of little avail. Its history and language bespeak the frigid years of the Cold War and the threat of nuclear decimation (Memorandum of Joint Legislative Committee on Interstate Cooperation, NY Legis Ann, 1963, p 221).[*] Its purpose was to provide for a functioning and continuing government, even if many officers of the several branches of government and their quarters had been atomized in a nuclear Armageddon, free of the constitutional limitations. Most important, it refers only to the continuity of governmental operations in the direct sense. Obviously, it does not mean and may not mean that the Constitution is always suspended in every emergency in a world and life that is a succession of emergencies, natural and manmade.

* * *
Emergencies and the police power, although they may modify their applications, do not suspend constitutional principles. It is not merely a matter of application to interpret the words of the Constitution and obligations issued subject to the Constitution *741 to mean exactly the opposite of what they say. The notes in suit provided that the city pledged its faith and credit to pay the notes and to pay them punctually when due. The clause and the constitutional mandate have no office except when their enforcement is inconvenient. A neutral court worthy of its status cannot do less than hold what is so evident.
The city and State, and to some extent the National Government, for almost two years have been engaged in a most difficult struggle to resolve the city's grave fiscal and economic problems. For well over a year many financial transactions have occurred on the assumption, however strained, that the moratorium would be constitutionally acceptable. In order to minimize market and governmental disruptions which might ensue it would be injudicious at this time to allow the extraordinary remedies in the nature of injunction and peremptory mandamus sought by plaintiff. Plaintiff and other noteholders of the city are entitled to some judicial relief free of throttling by the moratorium statute, but they are not entitled immediately to extraordinary or any particular judicial measures unnecessarily disruptive of the city's delicate financial and economic balance. (Cf. Worthen Co. v Kavanaugh, 295 US 56, 62, supra.) It is significant too that the Legislature will shortly meet in regular annual session and will be in a position once again to treat with the city's problems and to seek a fiscal solution in the light of the holding in this case. (New York State Bankers Assn. v Albright, 38 N.Y.2d 430, 441; cf. Matter of Hellerstein v Assessor of Town of Islip, 37 N.Y.2d 1, 14.) It would serve neither plaintiff nor the people of the City of New York precipitately to invoke instant judicial remedies which might give the city no choice except to proceed into bankruptcy. The strenuous and valiant efforts by the city and State administrations, with the aid of the National Government, should be given as much leeway as constitutional decency permits. Yet none of this means that remedy can be denied to plaintiff or to noteholders beyond the short period necessary to prepare for the consequences of the determination to be made in this case.
Accordingly, the order of the Appellate Division should be reversed, with costs, the moratorium statute declared unconstitutional, and the proposed remittitur settled on 30 days' notice.

*742 APPENDIX

GOVERNMENT

Memorandum of Joint Legislative Committee on Interstate Cooperation
Continuity of government operations
A. I. 24, Pr. 24, L. Lawrence[*] To Sec. of State
Constitution, Art. 3, § 25, new. The proposed amendment is an enabling measure, the purpose of which is to empower the Legislature to insure as far as possible the continuity of governmental operations throughout the State in periods of emergency brought on by enemy attack. It has no self-executing provisions; it requires legislative action. This amendment follows the form of the model amendment proposed by the Council of State Governments and the Office of Civil and Defense Mobilization. Its purpose is to permit the Legislature to provide for continuity of government unimpaired by constitutional inhibitions designed for the normal operation of the state government. The amendment will clear the way for legislative action in a number of areas where provision has to be made for emergency government to meet the extraordinary conditions that would follow enemy attack in the modern world.
A major concern of the amendment is the supply of manpower for keeping the governmental machinery in operation. Thus it deals specifically with the power to establish lines of succession to the powers and duties of public offices. As indicated by the phrase "of whatever nature", the power is broad enough to be applicable to legislative, judicial, executive and administrative offices. It is broad enough, for example, to authorize legislation in connection with "automatic" interim succession in depth to public office, in case of post-attack vacancy for any reason.
The grant is not restricted to manpower alone. It authorizes the adoption of measures of any kind relating to the continuity of operations. Here the aim is, after the manner of the "necessary and proper clause" of the national constitution, to equip the Legislature with a fair range of power in the choice of means.
However, the amendment gives no blank check to the Legislature. On the contrary, the power is subject to limitations. For one thing, they are implicit in the structure of the amendment. Thus the amendment is phrased in terms of a grant of new power (not removal of limits on existing powers) for the attainment of a stated objective, namely, continuity of governmental operations.
COOKE, J. (dissenting).
The New York City Emergency Moratorium Act of 1975, is, I submit, constitutional. Previously, the Appellate Division unanimously, and Special Term before it, found it constitutional. A declaration of unconstitutionality at this juncture departs from moratorium principles *743 established through the years by the highest courts of our State and Nation and overlooks certain specific constitutional provisions, all of which mandate a finding of constitutionality.

I
The declaration of a law as unconstitutional is a delicate task, to be entered upon only with reluctance and hesitation (see People v Beakes Dairy Co., 222 N.Y. 416, 426; 1 Cooley, Constitutional Limitations [8th ed], p 334). The postulate of constitutional adjudication is that every enactment of the Legislature is clothed with an exceedingly strong presumption of constitutionality (I. L. F. Y. Co. v Temporary State Housing Rent Comm., 10 N.Y.2d 263, 269; see New York v O'Neill, 359 US 1, 6). While the presumption is rebuttable, unconstitutionality must be demonstrated beyond a reasonable doubt and, only as a last resort, will courts strike down statutes on such a ground (Wiggins v Town of Somers, 4 N.Y.2d 215, 218-219; Defiance Milk Prods. Co. v Du Mond, 309 N.Y. 537, 541). The thrust of examination should be in the direction of validity, not invalidity, since a legislative act must be construed, if fairly possible, so as to avoid the conclusion that it is unconstitutional (United States v Jin Fuey Moy, 241 US 394, 401; Saltser & Weinsier v McGoldrick, 295 N.Y. 499, 509). Thus tested, it just cannot be said that the Emergency Moratorium Act is unconstitutional, much less unconstitutional beyond a reasonable doubt.
If any state of facts, known or to be assumed, justify the law, this court's power of inquiry ends (Defiance Milk Prods. Co. v Du Mond, supra; United States v Carolene Prods. Co., 304 US 144, 154).

II
Meeting in Extraordinary Session in September of 1975, the Legislature passed the New York State Financial Emergency Act for the City of New York (L 1975, chs 868, 869, 870). The Legislature expressly found that "a financial emergency * * * exists in the city of New York. The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders * * * These events [nonpayments to unpaid employees, vendors and suppliers, recipients of public assistance and city obligations] would effectively force the city to stop *744 operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants * * * If the city were unable, because of the lack of funds, to function in its normal manner, the economy of the state would, therefore, be drastically harmed * * * This situation is a disaster and creates a state of emergency" (L 1975, ch 868, § 1).
The emergency act was not enough to overcome New York City's financial problems and in November of 1975, again in Extraordinary Session, the Legislature enacted the New York State Emergency Moratorium Act for the City of New York (L 1975, ch 874, as amd by ch 875). This time, the Legislature found "that the grave public emergency found and declared to exist by the legislature in adopting the New York State Financial Emergency Act for the City of New York has dramatically worsened in the last two months * * * There is * * * an imminent danger that the city of New York will be unable to pay its outstanding short-term indebtedness and even to provide those basic services essential to the health, safety and welfare of its inhibitants and the continuation of orderly government in the city" (L 1975, ch 874, § 1). The Legislature's express purpose in enacting the Emergency Moratorium Act was "to ameliorate the disastrous consequences, to taxpayers, to holders of short-term obligations and to city residents, of an inability by the city to meet its financial and governmental responsibilities in full * * * [and] to avoid undue disruption of the process of financial recovery already underway, so as to facilitate restoration of the city's financial integrity and the payment of all its obligations" (L 1975, ch 874, § 1).
The existence of these facts supporting the legislative judgment  the "grave public emergency * * * [which] has dramatically worsened" and the "imminent danger that the city of New York will be unable * * * even to provide those basic services essential to the health, safety and welfare of its inhabitants and the continuation of orderly government in the city"  is presumed, although subject to rebuttal (United States v Carolene Prods. Co., 304 US 144, 152, supra; Lincoln Bldg. Assoc. v Barr, 1 N.Y.2d 413, 415). Upon judicial inquiry, legislative findings as to a "public emergency" are entitled to "great weight" (East N. Y. Sav. Bank v Hahn, 293 N.Y. 622, 627, affd 326 US 230; see Block v Hirsh, 256 US 135, 154-155). Such diverse persons and units as the President of the United *745 States, the Congress, the Governor, the Legislature, the New York City Council and the Mayor of the City of New York, representing different political affiliations and governmental strata, by their official acts, have all recognized the reality and depth of the financial distress of the City of New York. Indeed, the majority speaks of the (p 733) "city's desperate fiscal paralysis" and appellant has failed to demonstrate, or even state outright, that there is no emergency. Even where the question of what the facts establish is fairly debatable, far from this situation, we accept and carry into effect the findings of the Legislature (Old Dearborn Co. v Seagram Corp., 299 US 183, 196; Lincoln Bldg. Assoc. v Barr, supra).

III
The reversal by the majority and its holding of unconstitutionality as to the Emergency Moratorium Act is said to be "key[ed]" to the State Constitution provision that a city may not contract indebtedness unless it has pledged its "faith and credit" for the payment of the principal and interest of the indebtedness. It is asserted that the Emergency Moratorium Act, by depriving short-term noteholders of judicial remedies for at least three years, makes meaningless the verbal pledge of faith and credit. Purportedly, "Federal questions" need not be reached.
Section 2 of article VIII of the State Constitution, in pertinent part, reads: "No indebtedness shall be contracted by any * * * city * * * unless such * * * city * * * shall have pledged its faith and credit for the payment of the principal thereof and the interest thereon." (Emphasis added). As its language specifies, this provision prohibits the city from "contract[ing]" indebtedness without pledging its "faith and credit" for payment. There is no question but that the city did, in fact, make such pledge when it issued the notes to appellant, the Flushing National Bank, as well as to others. That fact is not denied and, indeed, appellant's brief and the exhibits submitted by it evidence the pledge. Thus, there was initial compliance by the city with this constitutional requirement. But the majority, disregarding the settled interpretation of "faith and credit", goes beyond the "indebtedness" which has been "contracted" and the pledge of "faith and credit". It holds that, by such a pledge, the city is (p 736) "constitutionally obliged to pay and to use in good faith its revenue powers to produce funds to pay the principal of the notes when due." *746 Thus, under such a view, the performance of the contract is also a matter of constitutional dimension and, therefore, in effect, in no situation whatever arising subsequent to the making of the required pledge, by legislation or otherwise, might the city be relieved of precise performance.
A faith and credit pledge simply means that the issuing government agrees to be generally obligated to pay the indebtedness out of all the government's revenues, rather than restrictively obligated only from specific revenues; it expresses an undertaking by the government to be irrevocably obligated in good faith to use such of its resources and taxing power as may be authorized or required by law for the full and prompt payment of the obligation according to its terms. In State v City of Lakeland (154 Fla 137), where bonds pledged either the "full faith, funds, property, credit and resources" or the "full faith, credit and resources" of the City of Lakeland, the Supreme Court of Florida declared at page 139: "We cannot agree that `surplus net revenues' of the light and water system of the municipality have ever been `pledged' to the payment of the debt, in the sense that the City now uses the word. In our view the pledge contained in the original obligations no more constitutes an express pledge of surplus light and water revenues, in the legal sense of the term, than it does of surplus funds derived from other municipal functions, either proprietary or governmental. In fact, such pledge does not create a specific lien on any particular property. It does no more, in legal effect, than express an undertaking by the City to be irrevocably obligated, in good faith, to use such of its resources and taxing power as may be authorized or required by law for the full and prompt payment of the principal and interest of the obligation as it becomes due under its terms." (Emphasis added.) Likewise, in Sacramento Municipal Utility Dist. v Spink (145 Cal App 2d 568, 576, 577), where bonds contained a covenant that "[t]he full faith and credit of said District are hereby pledged for the punctual payment of the principal and interest of this bond," a California District Court of Appeals "agree[d] with the interpretation of the Florida court [in City of Lakeland] and [held] that such a covenant does not pledge the revenues."
A correct analysis in respect to a "faith and credit" pledge was made by our own Court of Appeals in Matter of Tierney v Cohen (268 N.Y. 464). There, a local law attempted to establish an authority to construct and operate a plant to supply *747 electricity to consumers in the City of New York, to be financed by bonds of the authority as to which the credit of the city was not to be pledged (pp 470-471). The court declared the local law to be in violation of the then subdivision 5 of section 20 of the General City Law which read in part: "but, notwithstanding the provisions of any general, special or local law or ordinance a city shall have no power to issue obligations to which it has not pledged its faith and credit for payment of the principal and interest thereof." It was held at pages 472-473: "To decide otherwise would change the whole system of municipal financing and auhorize the city to build an electric lighting plant from the proceeds of bonds issued by an `authority' upon its own credit and not upon the credit of the city itself in direct violation of section 20, subdivision 5, of the General City Law". (See, also, 11 Opns St Comp, 1955, p 25; 3 Opns St Comp, 1947, p 528.)
The faith and credit pledge in the notes in question was but a single term of the contract, an undertaking in an agreement which created obligations contractual in nature (cf. Swift & Co. v Bankers Trust Co., 280 N.Y. 135, 142). When municipal notes or other obligations contain such a term and the municipality breaches its contractual obligation, such as by failing to take proper action in order that funds be made available to meet the obligations when due, the breach gives rise to an action for breach of contract (Snell v City of Long Beach, 27 NYS2d 164, affd 263 App Div 1021, affd 290 N.Y. 649).
The faith and credit pledge, as the words imply, requires no more than that the city make a good faith effort to use its resources, credit and powers to pay its indebtedness. This effort must be measured in the light of the city's over-all financial condition and its over-all obligations to its citizens and others. Parenthetically, the record, presented on return of the motion for summary judgment in December of 1975, presents a strong showing in this respect. An intensive and sustained effort has been made by those managing the city's affairs to restore its financial credit. Every step exhibits the city's good faith.
Some items are worthy of mention. In December, 1974, the Mayor directed a hiring freeze (Executive Order No. 24) so that between December 31, 1974 and July 31, 1975 there was a net reduction of about 18,500 full-time city employees, through layoffs or attrition, reducing the city's annual expenditure by an estimated $265 million. A "crisis budget" was *748 adopted for the fiscal year commencing July 1, 1975. The real estate tax for fiscal 1975-1976 was increased 11% over the prior year. In July, 1975 additional taxes, expected to yield about $325 million, were imposed. On June 10, 1975, the Legislature enacted the New York State Municipal Assistance Corporation Act (L 1975, ch 168) and created the Municipal Assistance Corporation for the City of New York (L 1975, ch 169), which corporation, by the sale of bonds to the public, underwriters, the 11 New York clearing house banks and the city and State pension funds, provided the city with a total of about $1.9 billion through September 5, 1975. In August, 1975, the city enacted Local Law No. 43 providing for a wage freeze effective for the first pay period ending on or subsequent to September 1, 1975. In September, 1975, the Legislature enacted the New York State Financial Emergency Act for the City of New York (L 1975, chs 868-870). Pursuant thereto, the city, with the approval of the Emergency Financial Control Board, adopted a three-year financial plan to balance the budget in fiscal 1977-1978 reducing the annual expenditure rate by an additional $724 million. To effect a reduction of $200 million in fiscal 1975-1976, the Mayor directed all city agencies to reduce their expenditure rates by an additional 8% during the remainder of said year, except for police, fire, correction and sanitation departments for which an additional 3% was directed and the New York City Health and Hospitals Corporation, the Board of Education and the Board of Higher Education for which an additional 4½% was ordered. As of October 31, 1975, the city's full-time employees had been reduced by 35,887 persons, resulting in annual personnel cost savings of approximately $510 million. The hiring freeze continued, it having been estimated that an additional 13,000 would leave the city's employ by June 30, 1976. The city halted all new construction and suspended work on 46 city-funded construction projects then underway. Eight fire companies were disbanded and seven schools and a municipal hospital were closed. Extensive efforts were made to obtain Federal assistance.

IV
In any event, the insertion of the faith and credit pledge into the contract could not possibly, nor did it purport to, immunize or insulate the entire contract, or even a part of it, from a valid exercise of the police power by the State. The *749 authority of the Legislature, in the exercise of its police power, may not be limited or restricted by stipulations in private contracts or in those between private parties and governmental units or agencies, since the police power is incapable of alienation by the parties (Buffalo East Side R. R. Co. v Buffalo St. R. R. Co., 111 N.Y. 132, 140; People ex rel. City of Geneva v Geneva, Waterloo, Seneca Falls & Cayuga Lake Traction Co., 112 App Div 581, 586, affd 186 N.Y. 516; 9 NY Jur, Constitutional Law, § 167, pp 71-72; cf. City of New York v Second Ave. R. R. Co., 32 N.Y. 261, 271; Brick Presbyt. Church v City of New York, 5 Cow 538, 540; 1 Cooley, Constitutional Limitations [8th ed], pp 436-437 [to the effect that the city has no power as a party to make a contract which would control the legislative powers of the Legislature]).
The Emergency Moratorium Act establishes a three-year moratorium on enforcement of outstanding short-term obligations[*] of the city, specifically "to avoid destructive actions during the time the city requires to regain its financial health." (L 1975, ch 874, § 1.) It provides that, during the "moratorium period", the enforcement of judgments and liens based upon any short-term obligations of the city, as well as the commencement or continuation of any actions upon such short-term obligations, shall be suspended, even though payment of such short-term obligations may be due according to their terms.
The majority's declaration of unconstitutionality, carried to its logical conclusion, simply means that there can be no moratorium laws affecting contracts containing a faith and credit pledge. This position not only disregards New York City's grave public emergency but is contrary to the long line of decisions by this court and the United States Supreme Court which recognize that every contract, public or private, includes an implied condition, as much a part of the contract as though written into it, by which there is implicitly reserved to the State the essential attributes of sovereign power to secure the health, safety and welfare of its people, notwithstanding interference with contracts.
Any notion, such as espoused by appellant Flushing, that the contract impairment clause of the United States Constitution (art I, § 10) is an absolute bar to State action with respect *750 to contracts was conclusively laid to rest over 40 years ago by the United States Supreme Court in Home Bldg. & Loan Assn. v Blaisdell (290 US 398, 447). We should not now proceed in the opposite direction, using as a vehicle the Federal Constitution or even, as attempted here, section 2 of article VIII of the State Constitution. In Blaisdell, the validity of the Minnesota Mortgage Moratorium Law was challenged as being repugnant to the contract clause. That law, like the Emergency Moratorium Act, was enacted because of an "economic emergency" (the depression of the 1930's) which threatened the "vital interests of the community" (290 US, at p 444). There, the Minnesota Moratorium Law, in some ways similar to the act here, authorized the suspension of the right of a mortgagee (a creditor) to collect the principal of the debt either by seeking foreclosure or bringing an action for a deficiency judgment for a period up to two years. The United States Supreme Court, in upholding the Minnesota Moratorium Law, outlined the relationship between the State's police power and the contract clause in terms which should govern the disposition here. It was recognized that "[w]hile emergency does not create power, emergency may furnish the occasion for the exercise of power" (290 US, at p 426). It was then declared (pp 434-435): "Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end `has the result of modifying or abrogating contracts already in effect.' Stephenson v. Binford, 287 U. S. 251, 276. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,  a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court." (Emphasis added.) The Supreme Court went on to state that (p 437) "[t]he economic interests of the State may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts" and, in such instances, that (p 438) "[t]he question is not whether the *751 legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end".
In 1933, also during the depression then prevalent, the State of New York enacted a mortgage moratorium law (L 1933, ch 793) to meet conditions which had arisen in the mortgage field due to financial stringency, it having been declared that there existed "a serious public emergency, affecting and threatening the welfare, comfort and safety of the people of the state." The effect of this statute was to suspend foreclosure of mortgages and legal action to recover the underlying indebtedness by holders of mortgages for nonpayment of principal. The constitutionality of this legislation was upheld unanimously by this court (Klinke v Samuels, 264 N.Y. 144 [1934]).
Year by year the 1933 statute was renewed for another year, except in 1941 when a two-year extension was made. When the 1937 re-enactment was challenged, this court again upheld the legislation (Maguire & Co. v Lent & Lent, 277 N.Y. 694 [1938]). Chapter 93 of the Laws of 1943 called for an extension to July 1, 1944, it being also provided that the owner of the mortgaged premises, in order to be entitled to the benefit of suspension of foreclosure, would have to amortize the principal at the rate of 1% per annum. Once more, when questioned, the legislative act was found to be constitutional by this court (East N. Y. Sav. Bank v Hahn, 293 N.Y. 622 [1944], supra). The Hahn case found its way to the United States Supreme Court (326 US 230, 232-233 [1945]), which declared: "The Blaisdell case and decisions rendered since (e.g., Honeyman v. Jacobs, 306 U. S. 539; Veix v. Sixth Ward Assn., 310 U. S. 32; Gelfert v. National City Bank, 313 U. S. 221; Faitoute Co. v. Asbury Park, 316 U. S. 502), yield this governing constitutional principle: when a widely diffused public interest has become enmeshed in a network of multitudinous private arrangements, the authority of the State `to safeguard the vital interests of its people,' 290 U. S. at 434, is not to be gainsaid by abstracting one such arrangement from its public context and treating it as though it were an isolated private contract constitutionally immune from impairment.
"The formal mode of reasoning by means of which this `protective power of the State,' 290 U. S. at 440, is acknowledged is of little moment. It may be treated as an implied *752 condition of every contract and, as such, as much part of the contract as though it were written into it, whereby the State's exercise of its power enforces, and does not impair, a contract. A more candid statement is to recognize, as was said in Manigault v. Springs, supra, that the power `which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the * * * general welfare of the people, and is paramount to any rights under contracts between individuals.' 199 U. S. at 480. Once we are in this domain of the reserve power of a State we must respect the `wide discretion on the part of the legislature in determining what is and what is not necessary.' Ibid. So far as the constitutional issue is concerned, `the power of the State when otherwise justified,' Marcus Brown Co. v. Feldman, 256 U. S. 170, 198, is not diminished because a private contract may be affected". (Emphasis added.)
Appellant's argument that Blaisdell and Hahn are inapplicable here because those "cases involve mortgage contracts between private parties", not "the government's own contractual debt obligations", is absolutely devoid of merit. While Blaisdell and Hahn did involve private contracts, more significantly, the Supreme Court in Blaisdell expressly applied the "reservation of essential attributes of sovereign power * * * read into contracts" to "all contracts, whether made between States and individuals, or between individuals only" (290 US, at p 435). It reiterated the rule that all contracts are made subject to this paramount authority (see Veix v Sixth Ward Assn., 310 US 32, 38). So, too, in Hahn, the Supreme Court stated that the "protective power of the State" is to be "treated as an implied condition of every contract" (326 US, at p 232). "All contracts" include those which contain the faith and credit pledge.
Appellant's attempt to distinguish between public and private contracts was even more particularly disposed of by the United States Supreme Court in Faitoute Co. v Asbury Park (316 US 502, 504). There, a statute was enacted "to meet the public emergency arising from a default in the payment of municipal obligations, and the resulting impairment of public credit" (Laws of NJ, 1931, ch 340, § 405). There, the New Jersey legislation, in providing for a denial to the holders of municipal obligations of the right to recover thereon and for a composition plan without their consent, under which the obligations would be substituted by securities authorized by *753 the plan of adjustment, went far beyond the scope of the Emergency Moratorium Act. There, the highest court in the land, in rejecting the by then threadbare claim of unconstitutionality stated (pp 513-514): "If a State retains police power [to alter contracts] with respect to building and loan associations, Veix v. Sixth Ward Assn., 310 U. S. 32, 38, because of their relation to the financial well-being of the State, and if it may authorize the reorganization of an insolvent bank upon the approval of a state superintendent of banks and a court, but over the dissent of one-fourth of the depositors (except preferred or secured claimants), Doty v. Love, 295 U. S. 64, a State should certainly not be denied a like power for the maintenance of its political subdivisions and for the protection not only of their credit but of all the creditors". (Emphasis added.)
Since the early days, an impregnable axiom has been that the State has the "same undeniable and unlimited jurisdiction over all persons and things, within its territorial limits, as any foreign nation; where that jurisdiction is not surrendered or restrained by the constitution of the United States" (City of New York v Miln, 11 Pet [36 US] 102, 139). The police power of the State, difficult of exact definition and demarcation, is but another name for the basic authority inherent in every sovereignty to pass all laws for the internal regulation and government of the State, necessary for the public safety and welfare (Nebbia v New York, 291 US 502, 523-524; People v Budd, 117 N.Y. 1, 14). It is one of the necessary attributes of civilized government (Ives v South Buffalo Ry. Co., 201 N.Y. 271, 300).
Just as the parties may not alienate or withdraw the police power from their contracts, likewise, it has been established by repeated decisions that this overriding power of the State, to establish all regulations necessary to secure the health, safety or general welfare of the community, can neither be abdicated nor bargained away by the State, all contract rights being subject to its fair exercise (Chicago & Alton R. R. Co. v Tranbarger, 238 US 67, 76-77). The State may not surrender or bind itself not to exert its police power (Phillips Petroleum Co. v Jenkins, 297 US 629, 635). It has also been observed that, since in all cases it is beyond the authority of the State or its municipalities to abrogate this power so necessary to the public safety, the exercise of the police power cannot be limited by contract and it is immaterial on what consideration *754 the contract rests (see 16 Am Jur 2d, Constitutional Law, § 299, p 587).
Of course, the police power is to be exercised within constitutional limitations (Kovacs v Cooper, 336 US 77, 83; People v Griswold, 213 N.Y. 92). An intent to exclude the State from exerting its police power must be clearly manifested (cf. Allen-Bradley Local v Employment Bd., 315 US 740, 749; State v Traffic Tel. Workers Federation of N. J., 2 NJ 335 [1949]). Here, there is no proscription against or limitation of the police power in respect to city indebtednesses which embrace a pledge of faith or credit  in section 2 of article VIII or in any other provision of the State Constitution. Thus, we have here no conflict between the police power exercise in the Emergency Moratorium Act and a constitutional provision.

V
It is readily conceded that the constitutional prescription of a pledge of faith and credit is operative in the event of mere "difficult economic circumstances", as suggested by the majority (p 736). The situation here, however, far transcends such a rather common municipal predicament. Here, there are not merely difficult economic circumstances but rather such a "grave public emergency" that there is an "imminent danger that the city of New York will be unable * * * even to provide those basic services essential to the health, safety and welfare of its inhabitants and the continuation of orderly government in the city." (L 1975, ch 874, § 1.) Here, there is not a mere incantation of financial emergency; the grave public emergency is live and a real one. This calls for the same "postulate of the legal order" and "government which retains adequate authority to secure the peace and good order of society" spoken to in Blaisdell (290 US 398, 435, supra); the same "sovereign right of the Government to protect the * * * general welfare of the people" addressed in Hahn (326 US 230, 232, supra); and the same "power [of a State] for the maintenance of its political subdivisions" mentioned in Faitoute (316 US 502, 514, supra).
The gravamen of the majority's argument is that the pledge of faith and credit in section 2 of article VIII of the State Constitution makes this case distinguishable from all others. But, even taking that view, the faith and credit pledge can be no more than an expression of the Federal contract clause in a specific provision in the State Constitution. And, that being *755 so, the line of cases beginning with Blaisdell are applicable and firmly lay to rest this argument as well.
The Federal decisions, such as those in Blaisdell, Hahn and Faitoute, should not be dismissed as (p 740) "cast[ing] little light on the State constitutional issues in this case." This is particularly so when examining the constitutionality of a statute, where every intendment is in favor of the statute's validity (Farrington v Pinckney, 1 N.Y.2d 74, 78). Those cases deal with State moratorium laws, as here. They juxtapose and then harmonize constitutional provisions regarding the strict enforcement of contract terms and the police power of a State to enact moratorium laws in times of emergency for the general welfare and to insure the continuity of government. As such, those holdings from the Nation's highest court, when applied to the instant fact pattern, are not only relevant but should be controlling  in pointing out the supremacy of the inherent sovereign power of the State over contracts when an "emergency may furnish the occasion for the exercise of [that] power" (Blaisdell, supra, p 426). In them we find reiteration of the rule that "all contracts are made subject to this paramount authority" (Veix v Sixth Ward Assn., 310 US 32, 38, supra). The manner in which the Supreme Court has analyzed the Federal contract clause in similar situations should now serve as a stare decisis precedent to be followed in our analysis in respect to our own State constitutional provisions when those provisions might be interpreted as limiting police powers.
The majority states that "in denying access to the courts there is in effect a denial of all remedy" and that "denial of a remedy is a denial of the right" (p 736). This is contrary to the principle expressed in Blaisdell, referred to by the majority for its proposition. In Blaisdell, it was pointed out that "`[w]ithout impairing the obligation of the contract, the remedy may certainly be modified'" (290 US, at p 430), that the constitutional provision regarding impairment of contracts is (p 434) "qualified by the measure of control which the State retains over remedial processes" and that (p 445) "the integrity of the mortgage indebtedness is not impaired". There, the issue was the reasonableness of a suspension of the mortgagee's right to foreclose or bring an action for a deficiency judgment for a period up to two years. Here, the issue is the reasonableness of the suspension of the noteholders' right to commence an action during the three-year moratorium period. *756 There and here, provisions were made for the payment of interest. Not only do the principles expressed in Blaisdell support a finding of constitutionality but the similarity of facts manifest that what the Legislature has done here is to effect no greater an impairment than in Blaisdell. So too, this court sustained the validity of two sections of the former Civil Practice Act which provided that during an emergency period an action to recover a money judgment for any indebtedness secured by a mortgage could not be maintained after the mortgaged premises had been sold under a judgment of foreclosure and sale, unless the right to a deficiency judgment was determined in the foreclosure action. This court then held explicitly that "reasonable limitations and restrictions may be placed upon actions to recover the debt, in order to meet conditions which constitute an imminent danger to the public welfare" (Honeyman v Hanan, 275 N.Y. 382, 395, app dsmd 302 US 375).
Although the faith and credit clause of the State Constitution and its implications are said to be the "crux" of the case, the majority then states that the fourth paragraph of section 2 of article VIII "confirms" that the Emergency Moratorium Act (p 737) "would boldly override constitutional limitations." The majority's analysis of this paragraph does not, however, support this statement. Since the majority uses the fourth paragraph merely to "confirm" its position, it is unnecessary to analyze fully the varying interpretations of this paragraph urged by appellants and respondents. The following comments should suffice.
First, the majority's analysis concerns only tax anticipation notes (TANS) and revenue anticipation notes (RANS) (the latter of which are here involved) which are not retired within five years after the date of original issue. The other obligations involved herein are bond anticipation notes (BANS) which, although mentioned elsewhere in the fourth paragraph, are not referred to in that portion of the paragraph analyzed by the majority. Thus, insofar as the majority seeks to confirm its position through an analysis of the fourth paragraph, its analysis is incomplete in that it neglects the provisions concerning BANS which provisions might not so easily be urged in confirmation of its position.
Secondly, the majority interprets the fourth paragraph as not allowing "discretion" with respect to the setting aside and application of first revenues at the suit of any holder of *757 defaulted obligations. This interpretation disregards the words of the provision. Throughout the fourth paragraph the word "shall" is used to express the mandatory nature of the procedures described therein. The last sentence, however, which the majority interprets as eliminating discretion, uses the words "may be required" to describe the procedures with respect to the setting apart and application of such revenues by the fiscal officer. This difference in wording manifests that the drafters of the fourth paragraph intended that whether to impose such a requirement at the suit of a holder is to be left to the discretion of the courts. Thus, in this sense also, the fourth paragraph does not confirm the majority's position.
Lastly, even assuming, but not conceding one whit, that there is such a mandate, in times where the very existence of government is threatened, the holding in the Blaisdell line of cases is ample precedent for the exercise of the State's police power at the expense of the contract.
In response to the majority suggestion (p 739), it is inappropriate to equate a freely elected Legislature's attempt to fashion a plan, not unlike those previously approved by this court and the United States Supreme Court in similarly severe situations, to avert the fiscal collapse of a government in the interests of the safety, health and welfare of the people, with a totalitarian or dictatorial Nation's debasement of an "elegantly phrased" Constitution.

VI
Over and above the sound legal principles thus far expressed, further support for the constitutionality of the Emergency Moratorium Act is expressly articulated in the State Constitution itself, the very same document as that upon which the majority attempts to ground its holding. Section 25 of article III of the State Constitution explicitly and broadly states:
"[Continuity of state and local governmental operations in periods of emergency.]

"Notwithstanding any other provision of this constitution, the legislature, in order to insure continuity of state and local governmental operations in periods of emergency caused by enemy attack or by disasters (natural or otherwise), shall have the power and the immediate duty (1) to provide for prompt and temporary succession to the powers and duties of public *758 offices, of whatever nature and whether filled by election or appointment, the incumbents of which may become unavailable for carrying on the powers and duties of such offices, and (2) to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations.

"Nothing in this article shall be construed to limit in any way the power of the state to deal with emergencies arising from any cause". (Emphasis added.)
The majority states that the invocation of this constitutional clause is of little avail. However, the most compelling criterion in the interpretation of a Constitution is the language itself (People v Carroll, 3 N.Y.2d 686, 689), the words employed being presumed to have been employed in their natural and ordinary meaning (People ex rel. Balcom v Mosher, 163 N.Y. 32, 36). The language of this provision (art III, § 25) is explicit and unambiguous in granting power to the Legislature and, under long-established rules of construction, the court is generally precluded from looking elsewhere for its meaning and the scope of the power conferred (Matter of Taylor v Sise, 33 N.Y.2d 357, 363). "Courts are reluctant to import into the Constitution that which is not there" (Matter of Sullivan v Hoberman, 34 AD2d 6, 9, affd 28 N.Y.2d 667; People ex rel. Gilbert v Wemple, 125 N.Y. 485, 489). Section 25 applies to periods of emergency caused by disasters, natural or otherwise. To interpret this section so as to apply to only certain disasters and not to others would violate the most basic rules of constitutional interpretation.
The Constitution of the State, as set forth in section 25, is presumed to have been prepared with the very greatest deliberation and to have been adopted only after every opportunity for reflection upon the meaning of each word was had by different Legislatures and the people at large; and when such language has a definite meaning, as here, it is not permissible to indulge in speculation in order to restrict and thereby alter the meaning (People ex rel. Gilbert v Wemple, 125 N.Y. 485, 489-490, supra; Settle v Van Evrea, 49 N.Y. 280; cf. Meltzer v Koenigsberg, 302 N.Y. 523, 525). Regardless of the intention expressed in the memorandum of the Joint Legislative Committee on Interstate Cooperation and even though the emergency clause of the State Constitution was triggered originally by fear of war or nuclear attack, the cold hard fact remains that the amendment as actually passed by two Legislatures and as approved by the electorate encompasses other situations *759 as well. This amendment, this broad constitutional provision, "speaks for itself" and includes not only emergency by enemy attack but also emergencies by disasters, natural or otherwise. It also guards against a construction limiting "in any way the power of the state to deal with emergencies arising from any cause." (NY Const, art III, § 25.)
Any argument that might be advanced to the effect that said section is not applicable in this situation disregards the words of section 25. In the first place, by the last paragraph, there is continued recognition of the police power of the State "to deal with emergencies arising from any cause". Furthermore, the title embraces "[c]ontinuity of * * * local governmental operations in periods of emergency", one of the legislatively expressed objects of the Emergency Moratorium Act. The first paragraph brushes aside any other provision of the State Constitution and authorizes the Legislature, "in order to insure continuity of * * * local governmental operations in periods of emergency caused by * * * disasters (natural or otherwise) * * * to adopt such * * * measures as may be necessary and proper for insuring the continuity of governmental operations." Since there properly was found a "grave public emergency" and "an imminent danger that the city of New York will be unable * * * even to provide those basic services essential to the health, safety and welfare of its inhabitants and the continuation of orderly government in the city," the Legislature had not only the "power" but the "immediate duty" to adopt the questioned measure. A city of eight million, deprived of even the most basic of services, would be a terrible tragedy, nothing short of a disaster, and an emergency, dire and critical in nature (see Matter of Orans, 45 Misc 2d 616, 637, affd 15 N.Y.2d 339).
Section 25 of article III of the State Constitution was adopted as an amendment on November 5, 1963, becoming effective January 1, 1964. The "faith and credit" provision of section 2 of article VIII is part of the Constitution which was adopted November 8, 1938 and became effective January 1, 1939. In construing the Constitution, it is to be read as a whole and every relevant provision of it is to be construed, if possible, so as to give effect to every other provision (Matter of Social Investigator Eligibles Assn. v Taylor, 268 N.Y. 233, 237; People ex rel. Balcom v Mosher, 163 N.Y. 32, 36, supra; People ex rel. McClelland v Roberts, 148 N.Y. 360, 367). Thus, while under section 2 of article VIII, no city shall contract an *760 indebtedness unless it pledges its faith and credit for payment, under section 25 of article III in "periods of emergency" arising from any cause the Legislature "in order to insure continuity of * * * local governmental operations * * * shall have the power and the immediate duty * * * to adopt such other measures as may be necessary and proper for insuring the continuity of governmental operations" and nothing in article III "shall be construed to limit in any way the power of the state to deal with emergencies arising from any cause." So viewed, the provisions are harmonized and under the explicit authorization of section 25 of article III the Legislature was empowered to adopt the Emergency Moratorium Act for the City of New York to insure "the continuation of orderly government in the city" and to avoid "the disastrous consequences * * * of an inability by the city to meet its financial and governmental responsibilities in full." (L 1975, ch 874, § 1.) Granted for discussion that there may be repugnancy between section 2 of article VIII (incorporated in the original document) and section 25 of article III (which came into being by way of amendment) and, further, that the sections cannot be construed so as to leave them both stand, then the amendment must prevail as the latest expression of the constitutional will of the people (People ex rel. Williams' Eng. & Contr. Co. v Metz, 193 N.Y. 148, 157; People ex rel. Killeen v Angle, 109 N.Y. 564, 575).

VII
In summary, the New York City Emergency Moratorium Act of 1975, viewed from either of two standpoints, is constitutional.
It is a valid exercise of the police power of the State in a period of unquestioned grave public emergency, which power is necessary for the public welfare and may not be surrendered by the State. No provision of the State or Federal Constitutions prohibits the exercise of this power in respect to debts of the city which have a pledge of faith and credit. Similar police power legislation effecting moratoriums in similar emergencies have been approved by the United States Supreme Court and the Court of Appeals, time and time again.
The act is explicitly authorized by section 25 of article III of the State Constitution, an amendment adopted in 1963, which, without ambiguity, provides that "[n]otwithstanding any other *761 provisions of this [State] constitution, the legislature, in order to insure continuity of * * * local governmental operations in periods of emergency * * * shall have the power and the immediate duty * * * to adopt such * * * measures as may be necessary and proper for insuring the continuity of governmental operations."
I dissent and vote to affirm the order of the Appellate Division.
Order reversed, etc. [See 40 N.Y.2d 1088, 1094.]
NOTES
[*] The memorandum is attached as an appendix to this opinion.
[*] Passed for first time in 1962 (A. I. 1492, L. Lawrence); to be submitted to voters at General Election of 1963.
[*] Defined by statute as tax anticipation notes, bond anticipation notes, revenue anticipation notes, budget notes and urban renewal notes of the city which are outstanding on the effective date of the act.